Richard BEATTY, Plaintiff-Appellant,

v.

The METROPOLITAN ST. LOUIS SEWER DISTRICT, Defendant-Respondent.

No. 51863.

Missouri Court of Appeals,
Eastern District,
En Banc.

April 14, 1987.

Motion for Rehearing and/or Transfer Denied May 20, 1987.

Application to Transfer Denied July 14, 1987.

Lewis C. Green, St. Louis, for plaintiff-appellant.

Thompson & Mitchell, Mary M. Bonacorsi, Charles B. Kaiser, Jr., St. Louis, for defendant-respondent.

PUDLOWSKI, Judge.

Appellant Richard Beatty brought an action for declaratory and injunctive relief arising from a revenue bond election held by respondent The Metropolitan St. Louis Sewer District (MSD) on August 7, 1984. After remand by the Missouri Supreme Court in *Beatty v. The Metropolitan St. Louis Sewer District*, 700 S.W.2d 831 (Mo. banc 1986), the case was tried in the Circuit Court of St. Louis County which found for MSD. On appeal, Beatty raises three issues: 1) that the court erred in finding the ordinance authorizing the election was not *ultra vires;* 2) that the court erred in failing to admit certain evidence offered by Beatty; and 3) that, even if the ordinance was not *ultra vires*, the court erred in holding that the imposition of fees by MSD upon its users to retire the bonds violated Article X, § 22 of the Missouri Constitution (The Hancock Amendment). We reverse.

In 1984, the MSD Board of Trustees adopted Ordinance 5630 calling for a special election on the proposition whether to issue revenue bonds in the amount of $60,000,000. The voters of St. Louis City and St. Louis County approved the issuance of these bonds which were to fund construction of eight pollution control projects. On March 13, 1985, MSD adopted Ordinance No. 5919 which issued the bonds and authorized repayment of the bonds from the revenues of all sewer facilities in the district. Approximately ten to twenty per cent of those who pay sanitary sewer user charges to MSD will not be served by any one of the proposed facilities.

Beatty's argument centers on § 3.020(15)(f) of the Plan of the Metropolitan St. Louis Sewer District (The Plan). It authorizes MSD "[t]o meet the cost of acquiring, constructing, improving or extending sewer or drainage facilities ... from the proceeds of revenue bonds, payable solely from the revenues to be derived from the operation of such sewerage facilities." The trial court found this language plain and unambiguous, holding it as authorizing MSD "to issue revenue bonds payable from the revenues of the entire sewer and drainage system." On review of a court tried case, we will not reverse judgment unless the court erroneously applies the law. Rule 73.01. A court is not at liberty to give a different effect to a statute when its meaning is clear and unambiguous. *Missouri Division of Employment Security v. Labor & Industrial Relations Commissions of Missouri*, 699 S.W.2d 788, 791 (Mo.App.1985). We agree with the trial court that the language is plain and unambiguous, but we find that the trial court has given The Plan an effect different from its clear and unambiguous meaning. "Such sewerage facilities" varies significantly from "the entire sewer and drainage system."

As both parties admit, the crucial issue here is what is meant by the term "such sewerage facilities" found in § 3.020(15)(f). MSD would give it reading similar to the trial court term "system." If the phrase merely stated "sewerage facilities," we might accept MSD's position, (although "facilities" and "system" are not precise synonyms). But the adjective "such," unless it is construed to be a meaningless appendage, prohibits us from a broad interpretation. Black's Law Dictionary defines "such":

> Of that kind, having particular quality or character specified. Identical with, being the same as what has been mentioned. Alike, similar, of the like kind. "Such" represents the object as already particularized in terms which are not mentioned, and is a descriptive and relative word, referring to the last antecedent.

Black's Law Dictionary 1284 (5th ed. 1979). Clearly, the antecedent is the facility to be acquired, constructed, improved or extended.

MSD argues that the pollution control facilities are improvements and extensions of the entire district since they will enhance the quality or value of the existing sewer and drainage facilities of the district. Therefore, district wide revenue bonds are allowable despite the fact that many users will never be served by the facilities. We agree that certain construction falls into the category of improvements or extensions of the entire district which costs must be allocated among the users. A facility such as a laboratory, which improves and extends all of the district's facilities would be overhead and properly allocable to all users. But MSD's expansive definition would deprive § 3.020(15)(f) of meaning since every construction in some way improves or enhances the value of existing facilities. The facilities proposed here serve eight distinct areas, not the district as a whole and to impose fees on non users runs afoul of The Plan.

It must be remembered that this method of financing construction was not the only means possible. At the time the plan was drafted, RSMo 250.110 authorized sewer districts to improve or extend their systems via revenue bonds "payable from the revenues derived or to be derived from the operation of the entire sewerage system of the district." V.A.M.S. § 250.110 (1983) (1951 Mo.Laws 638 § 10). That MSD chose language far more restrictive than that of the statute leads us to the conclusion that the Board of Freeholders which drafted the plan intended the reading urged by Beatty. MSD's contention that there is a "lack of evidence that the drafters of the Plan considered or even knew the language of the statutes" is most unpersuasive. MSD contends that the Board of Freeholders could have employed more explicit language had they decided to limit the issues of revenue bonds to the method suggested by Beatty. Comparing the language of The Plan with the relevant Missouri statute leaves us firmly convinced that such a limitation was specifically intended and accomplished.

MSD cites to several cases which authorize the pledging of revenues from the entire system in support of revenue bonds. We find each of those citations not on point as each one interprets language containing the expressed grant of authority not allowed by The Plan to MSD.

At oral argument, MSD offered the opinion that in a democracy such as ours, those who vote against tax increases are still obligated to pay them. MSD finds additional comfort in the fact that in order to issue revenue bonds, $\frac{4}{7}$ of the voters must approve. We recognize that "no" voters are required to pay the passed increases but the issue here is not that the "no" voters must pay the additional costs but rather what users are obligated to pay.

Because we find that the language of The Plan clearly precluded the issuance of MSD's bonds, we do not address the issue of legislative history (although we agree that such evidence only bolsters our conviction) nor will we address point two, the exclusion of certain exhibits by the trial court. Further, there is a stipulation by both parties that if the bonds are *ultra vires*, then point three, the issue of wheth-

er the rates were imposed in violation of The Hancock Amendment becomes moot.

In passing, we refer MSD to Article XI of The Plan which provides for amendments. Whether or not MSD's more restrictive, but self imposed, way to finance construction is sound public administration we cannot say. It may be that The Plan is as adopted in 1954 is not responsive to the needs of today, but it is not for us to evade The Plan's clear language by misreading it or by expanding the definitions of "improve" or "expand" to encompass nearly all construction. The goal of these bonds, clean water, is laudable public policy, but the method chosen to finance the bonds must be in keeping with MSD's self imposed rules.

SNYDER, C.J., and CRANDALL, KAROHL and GARY M. GAERTNER, JJ., concur.

CARL R. GAERTNER, J., dissents with separate opinion.

STEPHAN and SIMON, JJ., join in dissent of CARL R. GAERTNER, J.

SATZ, J., concurs in dissent.

CARL R. GAERTNER, Judge, dissenting.

I respectfully dissent. The majority opinion has taken a finding of fact by the trial court and transmogrified it into a conclusion of law. The trial court did not interpret the phrase "such sewerage facilities" as used in § 3.020(15)(f) of the Plan as being synonymous with "the entire sewerage and drainage system." Rather, the trial court found as fact that "the bond issue projects will improve or extend the [entire sewer and drainage] system." Therefore, the plain and unambiguous language of § 3.020(15)(f) allows utilization of the revenues of the entire system to fund the cost of improving or extending the entire system. In characterizing as a mere argument made by M.S.D. that the pollution control facilities are improvements to the entire district, the majority has overlooked the finding of the trial court based upon extensive and uncontroverted evidence pertaining to the area-wide benefits to be derived from the bond issue projects, as well as the disastrous effects upon the entire system if the projects are not timely completed. The oft-cited *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976) narrowly circumscribes appellate review of a court-tried case. We must accept the findings of fact of the trial court if they are supported by substantial evidence. Here, the evidence supporting the trial court's finding that the bond issue projects will improve or extend the entire system is substantial and uncontroverted.

That evidence can be briefly summarized. The Clean Water Act, 33 U.S.C. § 1251 et seq. mandates the upgrading of waste water treatment facilities from primary, i.e., fifty percent removal of pollutants, to secondary, i.e., ninety percent removal of pollutants, by July 1, 1988. In 1978 M.S.D. began the development of a comprehensive plan to be undertaken in stages to bring the entire system into compliance with the requirements of the Act. The comprehensive plan has been accepted by the Federal Environmental Protection Agency and the Missouri Clean Water Commission. Failure to comply with the scheduled start dates and completion dates of each of the projects encompassed by the comprehensive plan will result in not only the loss of several hundred million dollars in federal and state grants but also the assessment of fines and penalties against the district as a whole. In order to meet the matching funds requirement for federal and state grants pertaining to clean water projects scheduled prior to trial, M.S.D. "borrowed" money earmarked for other purposes. Regular maintenance and repair of facilities in various areas of the district were deferred. General fund expenditures were reduced by such measures as undercutting the proposed complement of personnel in order to make such funds available for M.S.D.'s matching share of three clean water projects. The evidence was undisputed that despite such temporary measures, without the bond issue revenue funds to meet the required match for federal funding of the remaining clean water projects,

monies for those projects would be exhausted by January, 1987.

In addition to these district-wide financial benefits related to compliance with the Clean Water Act, the trial court found the eight remaining projects to be financed by the revenue bonds would "serve and benefit the entire sewer district by, among other things ... achiev[ing] economies of scale in the treatment of sewage and the operations of the district as a whole; and ... improv[ing] water quality throughout the district." These findings are supported by the testimony, again undisputed, that the bond issue projects would eliminate 40 to 50 antiquated and inadequate treatment facilities scattered throughout the district. These are to be replaced by five to seven major treatment facilities serving various combinations of minor water sheds or subdistricts. This consolidation would materially reduce the administrative, operational and maintenance costs of the entire M.S.D. system, thereby benefiting all the users of the system. Furthermore, because of the natural water flow, improving the cleanliness of the water in one section of the area inevitably provides cleaner water in the other sections.

I cannot accept the conclusion of the majority that approval of the bond issue ordinances necessitates a misreading of § 3.020(15)(f) or an expansion of the definitions of "improving or extending." It requires no strained construction to say that bringing an entire system into compliance with the Clean Water Act improves the entire system. The fact that each stage of this improvement might be scheduled for different times at different locations does not denigrate the improvement of the whole. Accomplishment of the total improvement in stages pursuant to a comprehensive plan is economical and efficient. Moreover, extension is not limited to the single dimension of distance, but includes time and quantity. Certainly avoidance of the loss of federal funding and the assessment of penalties against the district as a whole extends its ability to continue to provide service. The benefits of increased capacity to remove pollutants from the water are as extensive as the flow of water

from the Missouri, Meramec, and Mississippi Rivers and their tributaries. Such benefits cannot be said to apply only within particular watershed areas.

The effect of the decision in this case is to preclude M.S.D. from financing long-range comprehensive district-wide improvements by revenue bonds. Each project of such a long-range plan would have to be financed separately and only by the revenues produced within the subdistrict in which a particular project might be located. Section 3.020(15)(f) is intended to prohibit district-wide financing for the construction of a sewer in an area where none existed before, which would benefit only residents of that area. It is unnecessary and unduly restrictive to apply that concept to each stage of a comprehensive project calculated to improve the district as a whole.

The majority opinion has enunciated an interpretation of § 3.020(15)(f) which is even more restrictive than that urged by appellant. In his brief, appellant argues that the funds available for retirement of revenue bonds are limited to the fees paid by the users "served" by the new facilities, thereby equating "served by" with benefited. In holding the present bond issue illegal because the proposed water treatment facilities will only "serve" eight distinct areas and ninety percent of the M.S.D. users, the majority implicitly equates "served by" with "used by." The voluminous documentary evidence introduced by appellant clearly demonstrates a history of charging the cost of improvements to those "benefited" thereby. The trial court expressly found that "completion of the revenue project at issue here will, indeed, benefit the entire district." As stated above, this finding is amply supported by substantial evidence and we are not at liberty to substitute our view of the facts for that of the trial court.

The majority found it unnecessary to address other contentions asserted by appellant as grounds for reversal. I find these contentions to be without merit. Appellant argues that the fees established by ordinance 5921 violate Article X, § 22 of the Missouri Constitution, The Hancock

Amendment. The same argument was rejected by the Supreme Court of Missouri in *Oswald v. City of Blue Springs*, 635 S.W.2d 332 (Mo. banc 1982), wherein the court held that voter approval of a bond issue by necessary implication carries with it approval of rate increases to meet the covenant with the bond holders without further voter approval.

Appellant's final contention charges trial court error in the exclusion of 17 of the more than 75 exhibits offered by appellant. Admission or rejection of evidence is generally not an issue on appeal of a court-tried case. *Mattingly v. Bruckerhoff*, 603 S.W.2d 11, 13 (Mo.App.1980). Pursuant to Rule 73.01(a) the excluded documents are before the reviewing court for such consideration as is appropriate. *Bernard McMenamy Contractors, Inc. v. Missouri State Highway Commission*, 582 S.W.2d 305, 314 (Mo.App.1979). I agree with the trial court that the excluded exhibits were irrelevant and, for the most part, cumulative. Exclusion of the exhibits does not warrant a finding of any abuse of the broad discretion vested in the trial court.

I would affirm the judgment of the trial court.

KAROHL, Judge, concurring.

I concur, but write separately in response to the dissenting opinion.

If I read the dissent correctly it adopts the view that the Federal Clean Water Act, 33 U.S.C. § 1251 et seq., imposes a mandate on MSD to upgrade its sewerage treatment by July 1, 1988; that any upgrade, described as "improvement or extension", must have area wide benefit; and, therefore, since all property owners within the entire system necessarily "benefit by" any upgrade project they should share the expense of "improvements or extensions" that directly serve only one sub-district and indirectly benefit the entire system. The dissent justifies this view because a failure by MSD to comply with the Clean Water Act will have disastrous results.

When the voters approved the MSD Plan, provisions of the Federal Clean Water Act were not a consideration. The trial court was required to find whether the eight projects submitted only for area wide approval were authorized by the Plan. The ultimate finding is a matter of law. The Plan provides for various forms of financing, construction and operation of MSD facilities. If the Plan does not authorize area wide financing by revenue bonds for a subdistrict improvement then MSD is free to resort to the other forms of approved financing or to submit the revenue bonds to the subdistrict. In either event approval would avoid any disastrous consequences.

The trial court and this court must consider what the eight projects are and who must approve and pay for them. This implicates Article X, § 22 of the Missouri Constitution, The Hancock Amendment. A system wide vote in favor will impose a revenue bond obligation on residents of a subdistrict even if the voters of the subdistrict disapprove.

Section 3.020(15)(f) of the Plan must therefore be interpreted. That section permits improvement or extension financed by revenue bonds *"payable solely* from the revenues to be derived from the operation of *such* facilities."* The dissent overrides or ignores the limitation of "solely" and replaces it with liabilities of all property owners in the entire district because an indirect benefit to the entire system will result when any part of the system is upgraded. The justification is the compulsion of the Clean Water Act and the disastrous consequences of failure to upgrade. But the Clean Water Act was not a consideration of the voters who approved the Plan and the results are avoidable by resort to other forms of financing. The plain meaning of the Plan must be considered without resort to speculation on consequences. The trial court was not at liberty to ignore the meaning of "solely" or "such facilities". The latter term refers to the "sewer and drainage facilities" earlier mentioned in the same paragraph.

MSD admits that during the entire history of its operation under the Plan it financed subdistrict improvements just like some of the eight projects presently considered by revenue bonds approved by and

payable "solely" by those property owners directly affected within the subdistrict. It also admits that property owners in those other subdistricts who paid or are paying for their subdistrict upgrade will now have the burden of also paying for the new projects which lie in other subdistricts. The historical facts mentioned in the dissent would rewrite history and by-pass admitted facts that "served by" and "used by" have previously governed under MSD's own interpretation of § 3.020(15)(f).

Nothing in the majority opinion will prevent MSD from financing long-range district-wide improvements with revenue bonds. They may do so by submitting district-wide projects to all voters in the district and subdistrict projects to voters within the affected subdistrict. Section 3.020(15))f) requires that procedure. Nothing would prevent MSD from securing voter approval to amend the Plan.

*Oswald v. City of Blue Springs*, 635 S.W.2d 332 (Mo. banc 1982) is not decisive here because the required voter approval by subdistrict was never obtained. There are other distinctions between the facts in *Oswald* and the present case. MSD apparently chose to by-pass the effect of the Hancock Amendment by changing its own interpretation of § 3.020(15)(f) in seeking only an area wide vote. Significantly the trial court excluded exhibits which were probative of MSD's own statements on the scope, or rather, the limitations, of § 3.020(15)(f) which conform with the majority opinion.

Neither the compulsion of the Clean Water Act nor the limitations created by the Hancock Amendment authorize the trial court or this court to re-interpret the scope of authority of MSD as set forth in the Metropolitan St. Louis Sewer District Plan. The question before the enactment of these new laws was the same as after their enactment, who must approve and who must bear the burden of paying for subdistrict improvements which directly benefit the subdistrict and only indirectly benefit not only all property owners within the entire system, but others downstream from the system. Both before and after the enact-

ment of these new laws the distinction between direct and indirect benefit existed. For more than twenty years before submission of these projects MSD respected the distinction which flows from interpreting § 3.020(15)(f) as appears in the majority opinion.

At oral argument before the court en banc MSD admitted that it is not at liberty to treat some property owners differently than others. If property owners within subdistricts not served directly by the current projects are required to pay for like projects in their own subdistricts, approved and financed solely by revenue bonds within their own subdistrict, and to now pay for similar projects in other subdistricts then they will be treated differently than property owners only within the subdistricts directly affected by the new projects.