Richard BEATTY, et al., Appellants,

v.

The METROPOLITAN ST. LOUIS
SEWER DISTRICT,
Respondent.

No. 76073.

Supreme Court of Missouri,
En Banc.

Dec. 21, 1993.

Lewis C. Green, Bruce Morrison, St. Louis, for appellants.

David Wells, Mary C. Bonacors, St. Louis, for respondent.

Christine M. Treat, City Atty., Lee's Summit, for amicus curiae Lee's Summit.

Robert W. McKinley, Tedrick A. Housh, III, Kansas City, for amicus curiae Gladstone.

Fred Boeckmann, Columbia, for amicus·curiae Columbia & Municipal League.

David L. Wieland, Springfield, for amicus curiae Springfield.

William D. Geary, Asst. City Atty., Kansas City, for amicus curiae Kansas City.

Charles E. Callier, Jr., Asst. City Atty., St. Charles, for amicus curiae St. Charles.

ROBERTSON, Judge.

In this case we return to our continuing struggle to define the perimeters of the Hancock Amendment and particularly of Article X, Section 22(a) of the Missouri Constitution. The specific issue is whether the respondent may raise its sewer charges without approval of district voters. The trial court held that respondent could raise its charges without a vote, relying principally on this Court's recent decision in *Keller v. Marion County Ambulance District*, 820 S.W.2d 301 (Mo. banc 1991). A divided panel of the court of appeals reversed the judgment of the trial court and ordered respondent to submit its charges to the voters for approval. The court of appeals, en banc, ordered transfer of the case to this Court. We have jurisdiction, Mo. Const. art. V, § 10, and now reverse the judgment of the trial court and remand the case with directions to enter an order declaring respondent's charges subject to Article X, Section 22(a) of the Missouri Constitution.

### I.

Prior to 1954, various private and governmental entities provided sewer service to the residents of the City of St. Louis and St. Louis County. On February 9 of that year, the voters of the region adopted a plan to create the Metropolitan St. Louis Sewer District ("MSD") to provide an integrated sewer system for the City of St. Louis and a majority of St. Louis County. The plan required the mayor of the City of St. Louis and the county executive of St. Louis County to appoint a six-member board of trustees to operate MSD. The plan also gave that board authority to impose ad valorem taxes and establish charges for sewer services. Under the plan, MSD took title to most of the existing sanitary and storm water sewer systems within the boundaries of the district. Today, MSD serves approximately 420,000 accounts, including single and multifamily dwellings and commercial and industrial customers, and owns and operates an extensive system of collector and interceptor sewers and treatment plants, all of which are subject to state and federal regulation. The continued ability of MSD to maintain and improve its sewer collection and treatment facilities and meet increasingly demanding state and federal regulations depends on MSD's ability to provide a revenue stream sufficient for those purposes.

For residential property, the board imposes a flat fee for sewer service. The amount of the fee remains the same no matter how much waste a residential customer sends into the system. Nonresidential customers pay a base charge plus a charge measured by the volume of waste the property adds to the system. Nearly all of the property owners within MSD receive MSD sewer charges. Failure to pay a sewer charge results in a lien against real property by operation of law. MSD is quick to point out, however, that approximately 9,000 parcels of property do not use the system and pay no service charge. These parcels escape the charge because they have an alternate means of sewage disposal or are unimproved.

Appellant Richard Beatty is a resident of St. Louis County, Missouri, owns real property there, and pays sewer charges imposed by MSD. In 1985, facing additional regulatory pressures and maintenance costs, MSD issued revenue bonds and increased its sewer charges to meet debt service on the bonds

and to operate and maintain the sewer system. MSD imposed these increased charges without voter approval. Mr. Beatty filed an action challenging MSD's authority to issue revenue bonds and increase its charges without a vote of the people. Mr. Beatty contended that Article X, Section 22(a) of the Missouri Constitution prohibited such an increase without voter approval. The court of appeals reversed the trial court's judgment that held that MSD had authority to issue the revenue bonds in question. *Beatty v. Metropolitan St. Louis Sewer District,* 731 S.W.2d 318 (Mo.App.1987) (en banc). Because MSD did not have authority to issue the revenue bonds, the user fees imposed in conjunction with the bond issue without voter approval violated Article X, Section 22(a). Following the court of appeals' decision, MSD entered into a consent decree and agreed that Article X, Section 22(a), applied to the sewer charges at issue in the case. MSD submitted the question of increasing its user charges to the voters in 1988. The voters approved the increases in wastewater charges (to $4.18 per month), capital improvement charges ($6.50 per month), and storm sewer charges ($0.24 per month).

In February, 1990, MSD sought the voters' permission to increase its sewer charges again. The voters rejected the increase.

On December 17, 1991, this Court issued its decision in *Keller.* A deeply divided Court held that a local ambulance district's increased charges for ambulance service were not fees within the meaning of Article X, Section 22(a). MSD read *Keller* in light of its financial needs and increased its wastewater charges by $4.00 per month without voter approval. Claiming a purpose to avoid rate shock, MSD's new charges did not change the gross monthly single-family residential bill; it remained at $10.29 per month. Instead, MSD offset the wastewater charge increase of $4.00 with a reduction in the capital improvement surcharge by a corresponding $4.00.

On June 17, 1992, Mr. Beatty and others filed a new action (*Beatty II*) in St. Louis County claiming that the decision in *Beatty I* was *res judicata,* required MSD to submit any increase in sewer charges to the voters for approval and, in any event, seeking a declaration that MSD's failure to submit its new charges to the voters for approval violated Article X, Section 22(a). MSD filed a motion to reopen *Beatty I,* seeking relief from the judgment in *Beatty I,* on June 26, 1992. That same day, MSD filed its motion to consolidate *Beatty I* and *Beatty II.* Ultimately, the trial court sustained these motions and consolidated the two cases. In none of its legal papers did MSD seek to recover sewer charges it lost as a result of the decision in *Beatty I* or to apply a favorable decision in *Beatty II* retroactively.

The trial court heard evidence, applied *Keller,* and held that the new sewer charges did not fall under Article X, Section 22(a). This appeal followed.

## II.

Article X, Section 22(a), prohibits a political subdivision of this state "from increasing the current levy of an existing tax, license or fees [sic], above that current levy authorized by law or charter when this section is adopted without the approval of the required majority of the qualified voters of that ... political subdivision voting thereon." MSD is a political subdivision of the state. Thus, the question before the Court is whether the sewer charge imposed by MSD is a "tax, license or fees" [sic] within the meaning of Article X, Section 22(a). If so, such charges cannot be increased without prior voter approval. In considering this question, we assume that MSD's silence on the issue is tantamount to an admission that the four dollar increase in the wastewater service charge constitutes an increase in the charges MSD requires its residential customers to pay. This decision, while predicated on MSD's tacit admission, does not decide the question whether the constitution requires voters to approve a political subdivision's decision to increase part of its fees and decrease another part where the amount due from the fee payer remains the same.

### A.

Mr. Beatty begins his brief with what he believes is a procedural *coup de grace.* He claims that Rule 74.06(b)(5) does not per-

mit the trial court to relieve MSD of the final judgment in *Beatty I*, that the consent decree in *Beatty I* is *res judicata*, and that MSD's consent decree in *Beatty I* estops MSD from claiming now that it may raise its sewer charges without voter approval.

While Mr. Beatty presents an interesting academic question, it is unavailing in this context. First, *Keller* raises a legitimate legal question as to whether MSD's charges fall under Article X, Section 22(a). Second, in apparent recognition of this fact and in response to MSD's interpretation of *Keller*, Mr. Beatty himself filed an independent action challenging MSD's increased sewer charges *prior to* MSD seeking to reopen the *Beatty I* decision. MSD's motion raises the identical, ultimate legal question joined by Mr. Beatty in his second suit. The trial court's decision to consolidate *Beatty I* and *Beatty II* and decide only the genuine legal issue raised in *Beatty II* eliminates Mr. Beatty's procedural claim. The point is denied.

### B.

*Keller* overruled *Roberts v. McNary*, 636 S.W.2d 332 (Mo. banc 1982). In doing so, *Keller* rejected "the contention that all fees—whether user fees or tax-fees—are subject to the Hancock Amendment." 820 S.W.2d at 304. To assist in determining whether a governmental charge is a tax within the meaning of Article X, Section 22(a), or user fee not subject to constitutional controls, *Keller* suggested a five-pronged analysis. *Keller*, 820 S.W.2d at 304–5, n. 10.

■ Mr. Beatty urges that we overrule *Keller* as wrongly decided. While the Court will continue to assess the wisdom and viability of *Keller's* holding in appropriate cases, we need not decide *Keller's* ultimate fate in this case. Application of the *Keller* test requires that MSD submit its sewer charge increase to the voters for approval in advance of implementation.

### 1. When Is the Fee Paid?

*Keller* informs that fees subject to Article X, Section 22(a), are "likely due to be paid on a periodic basis while fees not subject to [Article X, Section 22(a)] are likely due to be paid only on, or after provision of a good or service to the individual paying the fee." *Id.* at 304. Mr. Beatty argues that the sewer charge is paid on a periodic basis and thus falls within *Keller's* first test for inclusion within Article X, Section 22(a). MSD counters that sewer charges are payments for services rendered by MSD to the sewer customer and are thus goods or services under *Keller's* initial test.

MSD misunderstands the first *Keller* test. The question posed there is not whether the political subdivision provides a service but the regularity with which the fee is paid. In this case, the fee is imposed and paid on a periodic—quarterly—basis. Because the first *Keller* test concerns itself only with timing, we resolve the first issue in favor of Mr. Beatty's position.

### 2. Who Pays the Fee?

*Keller* says that a fee subject to Article X, Section 22(a) is "likely to be blanket-billed to all or almost all of the residents of the political subdivision while a fee not subject to [Article X, Section 22(a)] is likely to be charged only to those who actually use the good or service for which the fee is charged." *Id.* at 304. The record in this case reveals that only 9,000 of the approximately 420,000 parcels of real estate in the district are not subject to MSD charges. Mr. Beatty argues that this is "almost all;" MSD argues that only those persons receiving its sewer service pay the fee. While it is true that almost all residents of the district pay the charge, it is also true that only those persons who actually use MSD's services pay the charge. On application of the second prong of the *Keller* test, MSD has the better side of the argument.

### 3. Is the Amount of the Fee to Be Paid Affected by the Level of Goods or Services Provided to the Fee Payer?

The third *Keller* test suggests that fees subject to Article X, Section 22(a) are "less likely to be dependent on the level of goods or services provided to the fee payer while fees not subject to [Article X, Section 22(a)] are likely to be dependent on the level of goods or services provided to the fee payer."

*Id.* at 304. Mr. Beatty argues that the charge imposed by MSD bears no relation to the amount of the services MSD provides its customers; MSD argues that its charges, though admittedly uniform, reflect the estimated, average use a residential customer makes of MSD's services and, as to nonresidential customers, bears a direct relationship to the amount of service received.

*Keller's* third test focuses on the individual paying the fee. In order for a governmental charge to appear to be a user fee under *Keller's* third criteria, the charge imposed must bear a *direct* relationship to the level of services a "fee payer" actually receives from the political subdivision. If MSD's argument as to residential customers were correct, every tax, license, or fee would appear more like a user fee than an Article X, Section 22(a) tax. An economist could easily construct a model to show that any fee government collects is based on the "estimated, annual" use of governmental services by a taxpayer. Because the vast majority of MSD fee payers are residential, we conclude that Mr. Beatty has the better argument here.

### 4. Is the Government Providing a Service or Good?

The fourth *Keller* factor asks whether the charge paid by the "fee payer" is directly related to a service provided by a political subdivision. This factor distinguishes non-Article X, Section 22(a) fees from taxes generally, the latter being paid without relation to any specific service provided by government. On this fourth factor, MSD prevails; it clearly provides a service in return for a direct payment.

### 5. Has the Activity Been Historically and Exclusively Provided by the Government?

Each of the parties in this case points to a plethora of historical examples of the private or public provision of sewer services to assist their position. Application of the fifth factor is inconclusive, given the mix of public and private entities that have supplied sewer service historically.

In sum, application of the *Keller* test to the facts of this case provides no clear answer as to the nature of MSD's charges.

### C.

Reduced to its essence, the Hancock Amendment reveals the voters' basic distrust of the ability of representative government to keep its taxing and spending requirements in check. As an additional bulwark against local government abuse of its power to tax, the voters amended the constitution to guarantee themselves the right to approve increases in taxes proposed by political subdivisions of the state. Whether a governmental charge is a tax is the issue with which *Keller* struggled. And as *Keller* shows, the language employed in Article X, Section 22(a), is ambiguous.

In the face of ambiguous language in the organic document of the state, this Court is required to attempt to ascertain the intent of the voters from the language they adopted and to resolve doubts as to meaning in favor of that intent. Where, as here, genuine doubt exists as to the nature of the charge imposed by local government, we resolve our uncertainty in favor of the voter's right to exercise the guarantees they provided for themselves in the constitution.

As we have previously said, the facts of this case do not clearly define the nature of MSD's charges. Only fee payers who use its services pay for MSD's services. The charge imposed, however, is not directly related to the amount of services an individual, residential fee payer uses. In the end, our uncertainty as to the nature of the charge MSD imposes is heightened by the fact that unpaid sewer charges trigger a lien against real property by operation of law. Thus, we resolve our doubts in favor of the taxpayers and hold that MSD's charges are subject to Article X, Section 22(a), and may not be increased without prior voter approval.

### III.

The judgment of the trial court is reversed and the cause remanded.

COVINGTON, C.J., and BENTON, THOMAS, PRICE, and LIMBAUGH, JJ., concur.

HOLSTEIN, J., concurs in result in separate opinion filed.

HOLSTEIN, Judge, concurring in result.

I concur in result with the majority opinion. I add these comments only by way of pointing out that I do not join in the majority's application of the five-part test taken from the footnote of *Keller v. Marion Co. Ambulance Dist.*, 820 S.W.2d 301 (Mo. banc 1991).

I concede that I lacked enthusiasm when this Court adopted the proposition that a "fee," as used in article X, § 22(a) of the Constitution, only means those fees which are, in reality, a tax. But that is now the law. The very concept of the rule of law requires continuity and respect for precedent which is, by definition, indispensable. *Planned Parenthood v. Casey,* — U.S. —, —, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (1992). I do not here suggest abandonment of the fundamental holding in *Keller.* At the same time, I believe that the five criteria noted in footnote 10 of the *Keller* opinion are so vague and subject to manipulation that they will necessarily result in repetitive litigation and are unworkable. Careful consideration of the facts of this case according to the five criteria demonstrate how the factors may be manipulated by both government and taxpayer litigants to support their conclusions.

### 1. When is the fee paid?

The first criterion posits two questions regarding when the fee is paid: 1) are the fees paid on a periodic basis, and 2) are the fees paid only on or after the provision of a good or service to the individual paying the fee? If the answer to the first question is "yes" and the second is "no," then the fee is less likely to require voter approval. With regard to the first question, I agree with the majority that the answer is yes. As with all routinely recurring services, fees come due periodically. But the answer to the second question is also yes. The fees are calculated on the *previous year's cost* of operating the sewer system. Thus, under the first criterion, it is unclear whether the charge of MSD is subject to Hancock. In any event, this element may be manipulated so that charges may only occur after the rendering of services.

### 2. Who pays the fee?

The second criterion also is a two-pronged question. The first is, is this blanket billed to all or most all of the residents of the political subdivision? If the answer is "yes," then the fee is more like a tax. I suggest the answer is "yes" because assessing a fee against *all* tracts which have sewer service and in excess of 97% of all parcels, including those not having sewer service, is a blanket billing of "all or almost all" residents in the district. The second question posed under the second criterion is whether the charge is made only to those "who actually use the good or service for which the fee is charged." This question, if answered affirmatively, means the charge is more like a fee. Here again, the answer is a resounding yes. Virtually every property owner uses sewers. In other words, this criterion also is indecisive in determining whether this is a tax or a fee. Again, by simply narrowing the class of persons subject to the fee, this element can be manipulated.

### 3. Is the amount of the fee to be paid affected by the level of goods or services provided to the fee payer?

Under the third *Keller* test, charges dependent upon the level of goods or services provided are not as likely to be subject to article X, § 22(a). The majority suggests that if MSD based its charges on some method of measuring the quantity of sewage, such as the amount of water usage, rather than based on the type of usage, whether residential or nonresidential, MSD's charges are more likely to qualify as fees not subject to Hancock. In other words, through the mere expedient of manipulating the method by which the fees are assessed, a charge which is unconstitutional will become constitutional. Here again, I find that neither MSD nor the taxpayer has the better of the argument on this point.

### 4. Is the government providing a service or good?

I agree wholeheartedly with the majority on this point. MSD is providing a service. However, I do not believe that proof that a service is being provided is a valid basis for distinguishing between taxes and fees. Assessing a "public safety" fee to each citizen who calls for police or fire protection or a "cross walk" fee to parents who have children of school age does not make those charges any less like a tax. The fourth factor is, I believe, bogus. A governmental agency may always identify some service that it performs for its fee and thereby justify any charge it makes to its citizens.

### 5. Has the activity been historically and exclusively provided by the government?

Here again, the fifth factor is inconclusive given the mix of public and private entities that supply sewer services. In *Keller* I noted that in much of rural Missouri, ambulance services are exclusively provided by the government. In urban Missouri, sewer services are often provided by local government, and that has been true for many years. This factor will almost always be inconclusive, as it is here, where the charge is deemed a tax, and was in *Keller*, where the charge was deemed not a tax.

This brief analysis demonstrates that the five factors of footnote 10 from *Keller* are unworkable. Four of the five factors are highly subject to manipulation so that fees charged for a service in one community must have voter approval, but a fee for the same service in another community need not have voter approval. The fifth factor is almost always inconclusive. We should find objective standards by which to distinguish fees from taxes. Only if we are wholly unable to articulate workable standards should overruling *Keller* be considered. I again predict that we have not seen the last of this type of litigation.

We have now taken the five factors from a footnote and elevated them to the basis for analysis of this case. By promoting the factors to *ratio decidendi*, we have given force to what was heretofore not fully part of the reasoning in *Keller*. I cannot join in an opinion which enlarges the status of the five factors from the footnote. Nevertheless, the Court reaches a correct result under the law. The majority opinion makes substantial headway by stating that any uncertainty is to be resolved in favor of the voter's rights guaranteed by the Constitution. The burden is placed squarely on a governmental subdivision to show its charges are permissible without a vote. On that principle alone, this case should be reversed. I concur in that result.