MULLENIX – ST. CHARLES PROPERTIES, L.P., Village Of Bogey Hills Inc., and Ivan L. Mullenix, Plaintiffs/Appellants,

v.

CITY OF ST. CHARLES,
Defendant/Respondent.

No. 73134.

Missouri Court of Appeals,
Eastern District,
Division Three.

Oct. 20, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 6, 1999.

Application for Transfer Denied
Feb. 23, 1999.

Daniel P. Card, II, Paule, Camazine & Blumenthal, P.C., St. Louis, for appellants.

Mary M. Bonacorsi, Matthew J. Fairless, Pamela J. Meanes, Thompson Coburn, St. Louis, for respondent.

CRANE, Judge.

Plaintiffs, owners of multi-unit apartment complexes located in the City of St. Charles, brought an action against defendant, the City of St. Charles (the City), seeking a declaratory judgment, injunction, and other relief on their claim that the City's water and sewer rates were improper and invalid. The issues before the trial court were 1) whether the City complied with all applicable provisions of the City Code and ordinances in properly adopting and applying rates, charges and billing policies for the combined waterworks and sewerage system; 2) whether the City's master meter billing policy violated plaintiffs' rights to equal protection of the law; and 3) whether the City violated plaintiffs' rights under the Hancock Amendment in failing to submit its September, 1993 and July, 1994 sewer and water rate increases for voter approval. Plaintiffs appeal from the trial court's judgment in the City's favor. We affirm.

## FACTUAL BACKGROUND

*History of the City's Water and Sewer Service*

Under the authority of state statutes, the City furnishes its residents with both water and sewer service. Its combined water and sewer system is operated and managed by its Board of Public Works which sets rates for water and sewer service subject to approval by the City Council, as set out in the City Code.

In 1961, the Board of Public Works adopted a "master meter" or "per unit" billing policy for multi-unit buildings served by one meter. The City requires a separate water meter for each building. Under the "master meter" billing policy, the City bases its user and volume charges for apartment and condominium buildings upon the number of units served by each meter. The volume charge is computed by dividing the total water usage of the building by the number of units served by the meter and applying the applicable rate to the volume per unit. Each unit is then charged its portion of the volume charge as well as the user fee. The user fee

has been $2.00 per month since March, 1980, with one two-year exception.

As a result of ongoing operating losses, the City periodically increased its water and sewer rates. This appeal involves rate increases proposed by the Board of Public Works and approved by the City Council in September, 1993 and July, 1994.

As of July 1, 1994 City water bills contained four distinct charges: (1) a "gallonage charge" applied to water services; (2) a "gallonage charge" applied to sewer services; (3) a "minimum charge"; and (4) a "user charge." The July 1, 1994 charges illustrate the City's water and sewer rate structure:

### July 1, 1994 Water and Sewer Rates

| Water: | First | 10,000 gal. | $1.40 / 1000 gal |
| | Next | 30,000 gal. | $1.29 / 1000 gal |
| | Next | 60,000 gal. | $1.14 / 1000 gal |
| | All Over | 100,000 gal. | $1.07 / 1000 gal |

Minimum Charge: $7.00 for two months

User Charge: $4.00 for two months
(Daily rate of $0.0667 = $4.00 / 60 days)

| Sewer: | All Usage | | $1.57 / 1000 gal |

Minimum Charge: $7.00 for two months

User Charge: $4.00 for two months
(Daily rate of $0.0667 = $4.00 / 60 days)

The "gallonage charge" applied to water service is applied on a declining block rate schedule. When a customer has used all the water in the first rate block, that customer moves into the next rate block and is charged a lower rate for that water usage. The "gallonage charge" for sewer service is based on the metered water used by a customer and is charged at a flat rate. The "user charge" (also called a "service availability" or "base charge") is a charge paid by a customer regardless of whether the customer uses any water or sewer service. User charges are common components of water and sewer utility rates and are designed to cover the costs associated with customer billing, waterworks system availability, system maintenance, system repair, depreciation, and debt servicing. The "minimum charge" is the minimum bi-monthly charge a customer would pay for water and sewer service.

*Billing of Plaintiffs' Apartment Complexes*

Plaintiff Mullenix – St. Charles Properties (Mullenix) is a limited partnership formed on February 14, 1994. Plaintiffs Ivan L. Mullenix and the Village of Bogey Hills, Inc., are the two general partners of Mullenix. Mullenix owns, operates and manages two residential apartment complexes in the City of St. Charles: the Time Centre Apartments and the Village of Bogey Hills Apartments. The Bogey Hills apartment complex was constructed on or prior to January 1, 1986. Plaintiff, Village of Bogey Hills Inc., owned the Bogey Hills apartments and transferred all its right, title and interest in Bogey Hills to Mullenix on February 17, 1994. The Time Centre apartment complex was constructed in two stages. Phase I was fully constructed and completed on or prior to January 1, 1987. Plaintiff Ivan L. Mullenix owned Phase I of Time Centre and transferred all his right, title and interest in Phase I on February 17, 1994. Phase II commenced in 1995 and was completed in 1996.

The two apartment complexes have a combined total of 40 buildings and 1058 apartment units. Each of the 40 buildings in these complexes are served by a single "master" water meter. There are no separate water meters measuring water consumed by individual apartment units at either complex. The two complexes are billed under the "master meter" billing policy. Mullenix passes the cost of water and sewer service to its tenants.

In 1994 plaintiffs paid the complexes' sewer and water bills under protest and then filed this action challenging the rates and the policy. They appeal from the trial court's judgment in the City's favor. On appeal they challenge the trial court's verbatim adoption of the City's proposed findings of fact and conclusions of law, the evidentiary support for one finding, the omission of facts from the findings, the admission of an exhibit, and compliance with the City Code. They also assert that the rates deny equal protection and violate the Hancock Amendment.

### DISCUSSION

On review of a court-tried case, we sustain the judgment of the trial court unless

there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). As an appellate court we are admonished to exercise the power to set aside a judgment on the ground that it is against the weight of the evidence with caution and with a firm belief that the judgment is wrong. *Id. See also Gilmartin Bros., Inc. v. Kern*, 916 S.W.2d 324, 328 (Mo.App.1995); *Jun v. Murphy*, 763 S.W.2d 290, 295–96 (Mo.App.1988). We do not review *de novo, Murphy v. Carron*, 536 S.W.2d at 32, or reweigh the evidence, *Serafin v. Med 90, Inc.*, 963 S.W.2d 362, 362 (Mo.App. 1998). Rather, we accept the evidence and inferences favorable to the prevailing party and disregard all contrary evidence. *Harris v. Lynch*, 940 S.W.2d 42, 45 (Mo.App.1997). We defer to the factual findings of the trial judge, who is in a superior position to assess credibility. *Id.* However, we independently evaluate the trial court's conclusions of law. *Lake Cable Inc. v. Trittler*, 914 S.W.2d 431, 434 (Mo.App.1996).

### I. Verbatim Adoption of City's Proposed Findings, Conclusions, and Judgment

For their first point plaintiffs assert that the trial court erred in adopting verbatim the City's proposed findings of fact, conclusions of law and judgment. Plaintiffs contend that, in so adopting the City's proposal, the trial court abdicated its judicial responsibility and violated plaintiffs' due process rights under the United States Constitution's Fourteenth Amendment and Article I, Section 10 of the Missouri Constitution. Plaintiffs further argue that the trial court's adoption of the City's proposed findings of fact and conclusions of law without modification renders unconstitutional any presumption of correctness normally afforded the trial court's findings of fact under *Murphy v. Carron*, 536 S.W.2d at 32. We disagree.

Both plaintiffs and defendants requested that the trial court enter written findings and conclusions. Thirty-four days after the three-day trial in this case, both sides submitted proposed findings of fact, conclusions of law and post-trial briefs. Fifteen days

thereafter the trial court entered its findings of fact, conclusions of law and judgment. The trial court's findings and conclusions were identical to those proposed by defendants.

Plaintiffs' contention the trial court's action deprived them of due process was addressed and rejected by the Missouri Supreme Court in *State v. White*, 873 S.W.2d 590, 599–600 (Mo. banc 1994). In *White*, the court held:

Adopting all or part of a party's proposed findings, or adopting by reference the wording of a party's motion, has become a common practice among lawyers and judges in both criminal and civil cases. Courts frequently request both parties to draft findings of fact and conclusions of law that conform to how the court intends to resolve the issues in dispute. The court then takes the parties' recommendations under advisement and either drafts its own findings of fact and conclusions of law or adopts one of the parties' findings in whole or in part. As long as the court thoughtfully and carefully considers the parties' proposed findings and agrees with the content, there is no constitutional problem with the court adopting in whole or in part the findings of fact and conclusions of law drafted by one of the parties. Once the trial court determines that it agrees with one of the parties' findings and signs the order, the court has in effect adopted that party's findings as its own.

*Id.* at 600. The practice of adopting proposed findings of fact and conclusions of law does not violate the constitution as long as the trial court is satisfied that its findings and conclusions reflect its independent judgment. *Id.*; *State v. Dunn*, 889 S.W.2d 65, 77 (Mo.App.1994). The Supreme Court has admonished that "trial judges are well advised to approach a party's proposed order with the sharp eye of a skeptic and the sharp pencil of an editor." *Massman Const. v. Highway & Transp. Comm'n*, 914 S.W.2d 801, 804 (Mo. banc 1996). However, adopted proposed findings, " 'though not the product of the workings of the [trial] judge's mind, are formally his [or hers]; they are not to be rejected out-of-hand and they will stand if

supported by evidence.'" *State v. Kenley*, 952 S.W.2d 250, 261 (Mo. banc 1997) (quoting *United States v. El Paso Natural Gas Co.*, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964)). Point one is denied.

## II. *Challenges to Specific Findings of Fact*

In points two, three, four, five and seven, plaintiffs challenge the findings contained in paragraphs 12, 13, 14, 15, 16, 19, 20, 28 and 30 of the court's findings of fact. In point two they contend that paragraph 12 is not supported by substantial evidence. In the other points they contend that the remaining paragraphs are misleading because facts were omitted. We will address these in the order raised.

### A. *"User" Charge*

■ Plaintiffs assert that paragraph 12 of the trial court's findings of fact was not supported by competent and substantial evidence and was against the weight of the evidence.

In paragraph 12 the trial court found:

12. Since at least 1961, rates for City water and sewer service have included two components, a "user charge" and a "volume charge."

At trial, Karen McDermott, Finance Director for the City of St. Charles, testified to her knowledge of the history of the City's water and sewer rate structures:

Q. Now, at the time that you came to the City there was an existing rate structure in place in 1992, correct?

A. That is true.

Q. And that contained a two component rate structure for both the water and sewer which will be the user charge and the volume charge?

A. Yes, ma'am.

Q. And do you have any understanding as to how long over the history of the City's water and sewer utility operations, the rate structure was composed of a fixed or base charge and a volume charge?

A. It appears to date back all the way to 1961.

Q. Okay.

A. At least that far back.

On cross-examination, McDermott further testified that, although the charge was not termed a "user" charge prior to 1979, it served the same purpose. This testimony constitutes substantial evidence to support the trial court's finding. Further, in paragraphs 13 and 14 of its findings, the trial court made clear that it equated the "user" charge with a "base" or "fixed" charge. We cannot conclude that the judgment is wrong. Point two is denied.

### B. *Omission of Facts From Findings*

■ Plaintiffs next claim that paragraphs 13 and 14 of the trial court's findings of fact were correct but misleading because of the trial court's failure to include findings on other undisputed evidence. Plaintiffs claim that the court erred because "although such findings are, from a very narrow technical perspective, in accord with the evidence, such findings fail to recognize other pertinent information from the record." Similarly, plaintiffs assert that paragraphs 19 and 20 of the trial court's findings of fact "are only partially accurate" and "because of various omissions[,] the statements are grossly misleading." Likewise, plaintiffs argue that paragraphs 15 and 16 of the trial court's findings of fact were erroneous because "these factual findings, because of omissions, are grossly misleading." Again, plaintiffs contend that paragraphs 28 and 30 of the trial court's findings of fact are misleading because they omit other pertinent facts adduced at trial. These assertions present nothing for our review.

■ Plaintiffs do not argue that the trial court failed to make findings of fact which they had specifically requested under Rule 73.01(a)(3). The omission of unrequested findings of fact does not create trial court error on the basis that the findings which are made are "misleading" because unrequested findings were omitted. Points three, four, five, and seven are denied.

## III. *Admission of Evidence of "Per Unit" Billing of Certain Commercial Buildings*

For their sixth point plaintiffs assert that the court erred in admitting and failing to

strike evidence that, under its 1961 master meter billing policy, the City also billed a limited number of commercial enterprises, such as strip malls, on a "per unit" basis instead of on a "per meter" basis. Plaintiffs claim that they were surprised and prejudiced by the evidence because it had not been previously disclosed in discovery.

The trial court denied plaintiffs' objection on the grounds that similar evidence had been admitted without objection or by stipulation and that the issue had first been injected into the case by plaintiffs' experts. It also found no discovery violations.

 The record supports the trial court's ruling. If a party fails to object to opposed evidence at the earliest opportunity, any objection is waived. *Smith v. Kovac*, 927 S.W.2d 493, 500 (Mo.App.1996). Further, a party waives any objection to the admission of evidence that it has stipulated may be admitted. *Sellenriek v. Director of Revenue*, 826 S.W.2d 338, 339 (Mo. banc 1992).

 In addition, erroneously admitted evidence in a court-tried case is rarely, if ever, a cause for reversal and then only when it appears from the record that the court relied on the inadmissible evidence in arriving at its findings. *Washington Univ. v. Royal Crown Bottling*, 801 S.W.2d 458, 470 (Mo.App.1990). This is because a certain latitude is allowed in the admission of evidence in court-tried cases. *Id.* We presume that the trial court will sort out the incompetent and irrelevant and base its decision upon the competent and relevant evidence. *N.K.M. v. L.E.M.*, 606 S.W.2d 179, 187 (Mo. App.1980). If other competent evidence supports the judgment, the admission of improp-

er evidence is harmless error. *Estate of Hedrick*, 808 S.W.2d 30, 33 (Mo.App.1991).

 In this case, although the trial court made a finding that some commercial buildings were billed under the master meter policy, it did not rely on this evidence in resolving the legal issues before it which involved a comparison of the master metered apartments to other residential users, not commercial users.[1] There is no showing that this evidence was erroneously admitted over the objection raised or that the court relied on it in rendering its decision. Point six is denied.

### IV. *Compliance With City Code*

For their eighth point plaintiffs assert that paragraph 69 of the trial court's findings of fact, in which the court found that the challenged rates "were set in accordance with the policies and procedures of the Board," was not supported by competent and substantial evidence and was against the weight of the evidence. Plaintiffs also contend that the trial court erroneously declared and applied the law in concluding that the City complied with City Code Sections 33.161 and 52.55 in adopting the rate increases.

In their argument plaintiffs do not challenge the evidence that the 1993 and 1994 rate increases were proposed, that the proposed rates were published, that a public hearing was held on the rates thirty days later, that the rates were then adopted by the Board of Public Works, and that the rates were subsequently presented to, and approved by, the City Council. Rather, plaintiffs argue that the Board failed to follow its procedures in that it had not published its rules and regulations in the manner set out in City Code Sections 33.161 [2] and 52.55 [3].

---

1. We note that, in their brief, plaintiffs called the application of the master meter policy to some multi-unit commercial complexes a "distinction ... of no importance." In its brief the City agreed with this characterization.

2. Section 33.161 of the City Code provides as follows:
(A) The Board shall keep in its offices a full and complete record of all of its proceedings, and such records shall, during all normal business hours, be open to the inspection of the public.
(B) The Board may establish such necessary rules and regulations as it is empowered to do under Section 33.156; and any such rules and

regulations shall be maintained in a volume to be known as the "Rules and Regulations of the Board of Public Works," and shall be, during all normal business hours, open to the inspection of the public. These rules and regulations will relate to such topics as the Board deems appropriate, but they may include, in particular, the Board's internal procedures on its meetings, its administration, matters pertaining to setting of rates and matters pertaining to disputes on bills.

3. Section 52.55 of the City Code provides in relevant part:
(A) Rates and charges for the use and services of the sanitary sewer system of the City are to be

They specifically claim that the master meter billing policy was not set out in the Board of Public Works sewer regulations. They argue that, as a result, they were without notice that they were to be billed on a per unit basis at the time they went into business in St. Charles and that, if they had such information, they might have decided to build the complexes differently.

 The trial court found that plaintiffs had actual and constructive knowledge of the billing policy for years prior to the institution of the lawsuit and that they had accepted the benefits of water and sewer service through master metering since 1986 and therefore were not entitled to relief based on any alleged technical infirmity in the adoption, implementation, or application of the master meter policy. There was substantial evidence in the record that plaintiffs had actual and constructive knowledge of the master meter policy and that they had accepted the benefits of the policy by installing master meters in their complex rather than more costly individual meters. Further, the record does not support plaintiffs' assertion that they were prejudiced because they might have decided to individually meter each unit of their complexes if they had known of the policy. Plaintiffs' own witnesses testified that it would not have been physically or financially feasible to individually meter each unit and that master metering was "the only way to do it." Because plaintiffs had notice, accepted the benefits of the master meter policy, and demonstrated no prejudice, they are not entitled to relief. *City of Lexington v. Seaton*, 819 S.W.2d 753, 759 (Mo.App. 1991). The judgment in this respect is not wrong. Point eight is denied.

V. *Challenge to Lawfulness of Master Meter Policy as Applied to Apartment Complexes*

We set out Point Nine verbatim:

**SEPARATE AND APART FROM THE REASONS SET FORTH IN POINT I, THE CIRCUIT COURT ERRED IN ADOPTING VERBATIM PARAGRAPHS 55, 56, 57, 58, 59, 60, 61, AND 62 FROM THE CITY'S PROPOSED FINDINGS OF FACT AND THEN PART II (INCLUDING SUBHEADINGS A THROUGH R) FROM THE CITY'S PROPOSED CONCLUSIONS OF LAW TO THE EFFECT THAT THE CITY'S MASTER METER POLICY OF BILLING CERTAIN ENTITIES SUCH AS APARTMENT COMPLEXES, MOBILE HOMES, CONDOMINIUMS AND A LIMITED NUMBER OF COMMERCIAL ENTITIES SUCH AS A RETAIL STRIP MALL, ON A "PER METER BASIS," WHILE BILLING ALL OTHER USERS, BOTH SINGLE FAMILY RESIDENTIAL, AND 99% OF COMMERCIAL USERS, ON A "PER METER" BASIS IS LAWFUL.**

**THE COURT ERRED IN THAT: 1) DEFENDANT INSTEAD OF PROPOSING BASIC, OPERATIVE FACTS, IN REALITY MADE, BUT IN THE DISGUISE OF CREDIBILITY DETERMINATIONS REGARDING WHICH EXPERT'S OPINIONS WERE MORE REASONED AND LOGICAL, WHAT IN ESSENCE CONSTITUTE "MIXED MATTERS OF LAW AND FACT;" 2) THE COURT SHOULD HAVE CONFINED ITSELF FIRST TO ENUNCIATING THE BASIC, OPERATIVE FACTS; AND, 3) TO THE EXTENT THAT SUCH FINDINGS AND CONCLUSIONS INVOLVE MATTERS OF LAW THEY ERRONEOUSLY DECLARE AND APPLY THE LAW.**

**SPECIFICALLY, THERE ARE IN REALITY ONLY TWO OR THREE ESSENTIAL FACTS. THESE ARE: 1) THE CITY TREATS CERTAIN USERS SUCH AS PLAINTIFFS DIFFERENTLY; 2) THE MASTER METER BILLING POLICY OF TREATING APARTMENTS, MOBILE HOMES, CONDOMINIUMS AND A MINIMUM NUMBER OF COMMERCIAL USERS CREATES SUBSTANTIAL VARIANCES IN THE CITY'S CHARGES FOR WHAT IS ESSENTIALLY THE SAME SERVICE; AND 3) THE CITY HAS NO**

established by the Board of Public Works, pursuant to Section 33.158. Such rates and charges as are specifically set forth in the Rules and Regulations of that Board shall be made and collected against each lot, parcel of land, or premises which may have an active sewer connection with the sanitary sewer system of the city.

COST BASIS OR OTHER RATIONAL JUSTIFICATION FOR ITS POLICY OTHER THAN THIS IS HOW IT HAS BEEN DONE SINCE 1961 AND IT IS DOING SO IN THE BELIEF, WHETHER TRUE OR NOT, THAT DWELLING UNITS ARE BEING TREATED SIMILARLY.

CONTRARY TO ITS ARGUMENT, PLAINTIFFS RESPECTFULLY SUGGEST, IN LIGHT OF THE ENTIRE RECORD MADE HERE, THAT THE CITY HAS THE BURDEN OF FIRST SHOWING A COST JUSTIFICATION SO AS TO SUPPORT THE DISPARITY TREATMENT IN BILLING PRACTICES.

Plaintiff's ninth point is neither brief nor concise as required by Rule 84.04(d). *See Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978); *Kent v. Charlie Chicken II, Inc.*, 972 S.W.2d 513, 515 (Mo.App.1998). Further, this point assigns as error the trial court's factual findings in paragraphs 55 through 62, but does not support this contention with analysis or authority in the argument section of the brief, thus abandoning this claim. *Faith Baptist Church of Berkeley, Inc. v. Heffner*, 956 S.W.2d 425, 426 (Mo.App.1997)

■ Plaintiffs argue under this point that the trial court erred in concluding the application of the master meter billing policy did not violate the plaintiffs' right to equal protection under Article I, Section 2 of the Missouri Constitution, the Fourteenth Amendment of the United States Constitution, and 42 U.S.C. Section 1983. However, the point itself does not assign as error the trial court's failure to find a constitutional or equal protection violation. Arguments not fairly encompassed by the point relied on are not preserved for review. *Steward v. Goetz*, 945 S.W.2d 520, 528 (Mo.App.1997).

We will, however, exercise our discretion to review plaintiffs' equal protection arguments, even though not properly raised in the point. Plaintiffs argue that the master meter billing policy, as it is applied to the flat user fee for apartments and as it is applied to overall gallonage used by apartment buildings, violates equal protection.

■ In considering equal protection claims, we first look to see if the legislation creates a suspect classification or impinges on a fundamental right. *Casualty Reciprocal Exchange v. Missouri Employers Mut. Ins. Co.*, 956 S.W.2d 249, 256 (Mo. banc 1997). A suspect classification is one whose purpose or effect is to create classes, such as those based on race, national origin, or illegitimacy which, because of historical reasons, command extraordinary protection in a government by the majority. *Mahoney v. Doerhoff Surgical Services*, 807 S.W.2d 503, 512 (Mo. banc 1991). A fundamental right under this analysis is a right explicitly or implicitly guaranteed by the constitution such as the rights to free speech, to vote, to travel interstate, as well as other basic liberties. *Id.* Plaintiffs are not members of a suspect class and do not claim they have been denied a fundamental right.

■ Legislation that does not create a suspect classification or impinge upon a fundamental right will withstand an equal protection challenge if the classification bears some rational relationship to a legitimate state purpose. *Mahoney*, 807 S.W.2d at 512; *see also Casualty Reciprocal Exchange*, 956 S.W.2d at 257. Thus, to prevail, the challenger has the burden to show that a legislatively created classification is not rationally related to a legitimate state interest. *Casualty Reciprocal Exchange*, 956 S.W.2d at 257. If the legislative judgment is at least debatable, the issue settles on the side of validity. *Id.* Plaintiffs agree that the City's master meter policy must be evaluated for a "rational basis."

■ A municipality may classify its users for the purpose of fixing rates if the classification is reasonable and if there is no discrimination within the class. *Shepherd v. City of Wentzville*, 645 S.W.2d 130, 133 (Mo. App.1982). There is a strong presumption that the rates fixed by the municipality are reasonable. *Id.* The party challenging the rates has the burden of proving the rates are unreasonable. *Id.*

There is a rational basis for treating each unit of an apartment complex as any other residential unit:

An apartment house is an aggregation of dwellings. The rate charged a family living in a multi-family dwelling should be essentially the same as that charged a family occupying a residence. It seems entirely reasonable to adopt a classification which takes account of the ultimate consumer, rather than a classification limited solely to a consideration of the utility's operating cost. It is the consumer who will bear the ultimate economic impact of the charge. The increased rate will presumably be passed on by the apartment owner to the tenants, either in the form of increased rent or otherwise. The result seems eminently fair.

*Oradell Village v. Township of Wayne*, 98 N.J.Super. 8, 235 A.2d 905, 908 (1967). *See also Oklahoma City Hotel & Motor Hotel Ass'n. v. Oklahoma City*, 531 P.2d 316, 317 (Okla.1974).

Under the City's policy each ultimate residential user pays the same water and sewer charges for the same level of use. Apartment and condominium residents living in buildings served by a single meter pay the same "user charge" paid by individuals living in single family residences. Each residential unit, whether in an apartment complex or standing alone, is subject to the same declining block rate schedule for water and sewer services. Expert testimony at trial established a difference between the nature of residential use of a water and sewer system which creates peak demands and requires excess capacity and commercial use which does not. The difference in use supports billing the individual units of an apartment complex the same fees and rates as other residential units and not billing the complex as one commercial unit.

▮ Plaintiffs argue that the City had the burden of showing a cost justification through a cost of service study in order to show a rational basis. We disagree. In *Shepherd* we held that "cost of service is but one consideration in the determination of the reasonableness of the rate" and that it would be the plaintiff's burden to prove cost of service if a plaintiff was challenging rates on that basis. 645 S.W.2d at 133.

▮ Because the City had a rational basis for distinguishing between commercial and residential water and sewer users and treating the individual units in plaintiffs' complexes like other individual residential users, the City's master meter billing policy did not violate the plaintiffs' right to equal protection. Point nine is denied.

VI. *Hancock Amendment Challenge to Water and Sewer Rates Adopted in 1993 and 1994*

In their tenth point plaintiffs contend the trial court erred in adopting paragraphs 10, 37, 38 and 39 of the trial court's findings of fact. Plaintiffs also assert that the trial court erroneously declared and applied the law in Part III of its conclusions concluding the Hancock Amendment did not require the City of St. Charles to seek voter approval of its water and sewer rates adopted by the Board of Public Works in September, 1993 and July, 1994.

In the point relied on, plaintiffs do not indicate wherein or why the findings of fact in paragraphs 10, 37, 38 and 39 were erroneous. In addition, plaintiffs do not develop any argument relating to their contention that these findings of fact are erroneous. This portion of this point is deemed abandoned and presents nothing for appellate review. *See Brancato v. Wholesale Tool Co., Inc.*, 950 S.W.2d 551, 553 (Mo.App.1997); *Faith Baptist Church*, 956 S.W.2d at 426. We address only plaintiffs' claim that the trial court erroneously declared and applied the law when it concluded that the Hancock Amendment did not require the City to seek voter approval of its water and sewer rates adopted by the Board of Public Works in September, 1993 and July, 1994.

The Hancock Amendment, Article 10, Section 22 of the Missouri Constitution, provides in relevant part:

(a) Counties and other political subdivisions are hereby prohibited from levying any tax, license or fees, not authorized by law, charter or self-enforcing provisions of the constitution when this section is adopted or from increasing the current levy of an existing tax, license or fees, above that current levy authorized by law

or charter when this section is adopted without the approval of the required majority of the qualified voters of that county or other political subdivision voting thereon.

 Plaintiffs argue that the sewer rates fall within the classification of "tax, license or fees" subject to this amendment. The Missouri Supreme Court has rejected the contention that all fees, whether user fees or tax-fees, are subject to the Hancock Amendment. *Keller v. Marion County Ambulance Dist.*, 820 S.W.2d 301, 304 (Mo. banc 1991). Rather, it has held that the Hancock Amendment applies only to revenue increases which are in fact tax increases, whether labeled as taxes, licenses, or fees. *Id.* at 303–05. Revenue increases which are in fact fees for services rendered in connection with specific services ordinarily are not taxes unless the object of the requirement is to raise revenue to be paid into the general fund of the government. *Id.* at 303–04. Thus, courts must examine the substance of a charge to determine if it is a tax subject to the Hancock Amendment, without regard to the label placed on the charge. *Id.* at 305.

In *Keller* the court delineated the following guidelines to determine if a fee is a tax:

In order to determine whether a revenue increase by a local government is an increase in a "tax, license or fees" that requires voter approval under the Hancock Amendment, the following are critical:

1) When is the fee paid?—Fees subject to the Hancock Amendment are likely due to be paid on a periodic basis while fees not subject to the Hancock Amendment are likely due to be paid only on or after provision of a good or service to the individual paying the fee.

2) Who pays the fee?—A fee subject to the Hancock Amendment is likely to be blanket-billed to all or almost all of the residents of the political subdivision while a fee not subject to the Hancock Amendment is likely to be charged only to those who actually use the good or service for which the fee is charged.

3) Is the amount of the fee to be paid affected by the level of goods or services provided to the fee payer?—Fees subject to the Hancock Amendment are less likely to be dependent on the level of goods or services provided to the fee payer while fees not subject to the Hancock Amendment are likely to be dependent on the level of goods or services provided to the fee player.

4) Is the government providing a service or good?—If the government is providing a good or a service, or permission to use government property, the fee is less likely to be subject to the Hancock Amendment. If there is no good or service being provided, or someone unconnected with the government is providing the good or service, then any charge required by and paid to a local government is probably subject to the Hancock Amendment.

5) Has the activity historically and exclusively been provided by the government?—If the government has historically and exclusively provided the good, service, permission or activity, the fee is likely subject to the Hancock Amendment. If the government has not historically and exclusively provided the good, service, permission or activity, then any charge is probably not subject to the Hancock Amendment.

*Id.* at 304 n. 10.

 The court has characterized the above criteria as "helpful" in "examining charges denominated as something other than a tax." *Id.* It has specified that "no specific criterion is independently controlling; but, rather, the criteria together determine whether the charge is closer to being a 'true' user fee or a tax denominated as a fee." *Id.*

The court has used the *Keller* criteria in *Beatty v. Metropolitan St. Louis Sewer District*, 867 S.W.2d 217, 220–21 (Mo. banc 1993) as has this court in *Missouri Growth Ass'n v. Metropolitan St. Louis Sewer District*, 941 S.W.2d 615, 622–25 (Mo.App.1997). We thus start our analysis with the five questions suggested in *Keller*.

1. *When is the fee paid?*

The parties stipulated that water and sewer bills were paid bi-monthly. These charges can accordingly be characterized as periodic. However, they are also due to be paid only

on or after the provision of a good or service to the payor. In *Beatty* the court found the periodic nature of the billing for ongoing services to be controlling. *Id.* In *Beatty* the utility charged a flat monetary fee for service irrespective of the amount of service actually provided in the billing period. *Id.* On the other hand, in this case, the bills were based on metered water readings and were thus due to be paid after the provision of an actual and specific good or service to the individual paying the fee.

2. *Who pays the fee?*

The evidence presented to the trial court showed that the City charged only those customers who actually used sewer or water services. No evidence was presented that the City blanket-billed all or almost all of the residents of the City of St. Charles. This evidence weighs in favor of a finding that the charge is a user fee. *Beatty,* 867 S.W.2d at 220; *Missouri Growth,* 941 S.W.2d at 623.

3. *Is the amount of the fee to be paid affected by the level of goods or services provided to the fee payer?*

"In order for a governmental charge to appear to be a user fee under *Keller's* third criteria, the charge imposed must bear a *direct* relationship to the level of services a 'fee payer' actually receives from the political subdivision." *Beatty,* 867 S.W.2d at 221. (Emphasis in original.)

The record supports a finding that the charges for water and sewer services on each bill were based on the level of water provided to the customer. Garth Ashpaugh, an expert on water and sewer rates called by the plaintiffs, testified on cross-examination that "the gallons that are used determine the bill." Robert Ori, a utility expert and financial consultant to the utility industry called by the plaintiffs, testified that "there is a direct relationship in application of bill to the gallons" and explained that "gallons times rate equals [the] consumption charge."

Plaintiffs argue that the "user charge" component of the water and sewer rates charged by the City bears no direct relationship to the level of services the fee payer actually receives from the City at the time the user charge is paid. McDermott, the City's finance director, testified that the "user charge" included in the City's water and sewer bills covered the costs of billing and "service connection capability and availability."

In *Missouri Growth* we held that where sewer customers are charged by individual consumption, the fact that their bills include uniform fees for "billing and collection" and "system availability" does not prevent a finding that the charge bears a direct relationship to the services rendered. 941 S.W.2d at 623.

Plaintiffs additionally argue that the user charge includes payments for future capital improvements which are not payments for goods or services provided. There was substantial evidence to support the trial court's finding that the rate increases were insufficient to fund capital improvements.

4. *Is the government providing a service or good?*

Both parties agree that the City is providing a service or good.

5. *Has the activity historically and exclusively been provided by the government?*

At trial Billy Sankpill, called by the City as an expert on utility rate making, testified on direct examination: "Both water and sewer has been provided by investor-owned companies and municipalities since the eighteen hundreds that I know about." Sankpill testified that approximately seventy-five investor-owned utilities remained operating in Missouri. This testimony shows that sewer and water services have not been historically and exclusively provided by the government. The evidence does not establish that water and sewer services are conclusively either public or private. *See Beatty,* 867 S.W.2d at 221. However, the fifth *Keller* factor turns on whether the government is or is not the "exclusive" provider of services. The evidence does show that the government has not historically been the exclusive provider of water and sewer services.

*Keller* advises that we consider these criteria together to determine whether the charge is closer to being a user fee or a tax denominated as a fee. 820 S.W.2d at 304 n. 10. The

*Keller* opinion was premised on the traditional distinction between fees and taxes which the court restated in *Zahner v. City of Perryville*, 813 S.W.2d 855, 859 (Mo. banc 1991):

> Fees or charges prescribed by law to be paid by certain individuals to public officers for services rendered in connection with a specific purpose ordinarily are not taxes ... unless the object of the requirement is to raise revenue to be paid into the general fund of the government to defray customary governmental expenditures ... rather than compensation of public officers for particular services rendered....

(citations omitted).

There was substantial evidence in the trial court that sewer and water services have not historically been provided exclusively by a governmental entity. The sewer and water services in this case were supplied by a municipality to its citizens. The municipality billed the water and sewer customers periodically for the actual amount of services supplied during the billing period by basing the bills on the metered amount of water usage. The fact that the bills also included certain flat administrative fees does not change the essential characteristic of the bills from user fees to taxes. The water and sewer bills in this case are clearly user fees for the particular services rendered.

The trial court did not erroneously declare or apply the law. Point ten is denied.

Plaintiffs last request that, if we deny point ten, we transfer the case to the Missouri Supreme Court under Rule 83.02. We deny this request as premature. *See* Rule 83.02.

The judgment of the trial court is affirmed.

SIMON, P.J., and MOONEY, J., concur.