Robert L. WENZLAFF, et al., Plaintiffs-Respondents,

v.

Morgan LAWTON and City of Frontenac, Defendants-Appellants.

Lawrence N. WEENICK, Plaintiff-Respondent,

v.

CITY OF UNIVERSITY CITY, Defendant-Appellant.

Nos. 64862, 64863.

Supreme Court of Missouri, En Banc.

June 30, 1983.

Shulamith Simon, Maxine I. Lipeles, St. Louis, George Helfers, Clayton, Dennis Kay, St. Louis, for defendants-appellants.

Lewis C. Green, St. Louis, Lawrence N. Weenick, Clayton, for plaintiffs-respondents.

BILLINGS, Judge.

Consolidated suits by taxpayers of Frontenac and University City challenging 1982 property tax ordinances of the two cities as violative of the Hancock Amendment [Article X, §§ 16–24, Missouri Constitution]. The trial court granted declaratory and injunctive relief to taxpayers after finding and determining the tax increases contained in the ordinances had not been approved by the voters as required by the Amendment. We affirm.

Cities admit the ordinances in question increased levies which were in existence on November 4, 1980, the effective date of the Amendment. However, they contend that because the increased tax rates are within the authorized constitutional and statutory maximum rates, voter approval was not required.

The pertinent part of the Amendment is § 22(a), which provides in part as follows:

Counties and other political subdivisions are hereby prohibited from levying any tax, license or fees, not authorized by law, charter or self-enforcing provisions of the constitution when this section is adopted or *from increasing the current levy of an existing tax ... above that current levy authorized by law or charter when this section is adopted without the approval of the required majority of the qualified voters....*" (Our emphasis)

We first observe that § 22(a) contains two separate and distinct clauses. We think it is clear that the first clause prohibits political subdivisions from levying, without voter approval, a tax that was not authorized by law when the Amendment was adopted. We think it equally clear that the second clause requires voter approval before there can be an *increase* in the current levy of an existing tax above

the current levy authorized by law on November 4, 1980.

Here, the cities increased the current levy of the taxes in question above the current levy in effect on November 4, 1980. They contend they have the authority, under the Amendment, to increase property taxes, without the required approval of the voters, up to the maximum rate authorized by law. This argument ignores the second clause of § 22(a) and the language therein concerning *"current levy of an existing tax."*

A cardinal rule of constitutional construction is that "every word in a constitutional provision is presumed to have effect and meaning." *Buechner v. Bond,* 650 S.W.2d 611 (Mo. banc 1983).

"This Court has recognized that in construction of constitutional provisions, it should undertake to ascribe to words the meaning which the people understood them to have when they adopted the provision. *State ex inf. of Danforth v. Cason,* 507 S.W.2d 405, 408 (Mo. banc 1973). 'The framers of the Constitution and the people who adopted it "must be understood to have employed words in their natural sense, and to have intended what they have said." This is but saying that no forced or unnatural construction is to be put upon their language.' *State ex inf. Danforth v. Cason,* 507 S.W.2d at 409; *State ex rel. Heimberger v. Board of Curators of University of Missouri,* 268 Mo. 598, 188 S.W. 128 (banc 1916) .... Of course, this Court must give due regard to the primary objectives of the provision under scrutiny as viewed in harmony with all related provisions, considered as a whole. *State at the Information of Martin v. City of Independence,* [Mo.] 518 S.W.2d [63] at 66." *Roberts v. McNary,* 636 S.W.2d 332, 335 (Mo. banc 1982).

In considering the provisions as a whole, in harmony with all other provisions, we reject cities' contention. To do otherwise would amount to an unnatural construction and render the second clause meaningless. Our conclusion is consistent with the objectives of the Amendment as understood by the voters. The official ballot title for the

Amendment specifically informed the electorate that it "prohibits local tax or fee increases without popular vote."

The "Amendment ... is popularly described as 'the taxing and spending lid' ..., words which also reflect its central purpose." *Buchanan v. Kirkpatrick,* 615 S.W.2d 6, 13 (Mo. banc 1981). Limiting the ability of municipalities to increase taxes accords with the objectives of the Amendment as a whole.

The judgment of the trial court is affirmed.

RENDLEN, C.J., HIGGINS, GUNN and DONNELLY, JJ., and HOUSER, Senior Judge, concur.

BLACKMAR, J., concurs in part and dissents in part in separate opinion filed.

WELLIVER, J., not sitting.

BLACKMAR, Judge, concurring in part and dissenting in part.

I concur in the result reached in Case No. 64862, involving the City of Frontenac. I also concur in the result reached in the University City case, No. 64863, as to the general revenue levy and the library tax, but I dissent as to the levy of $.34 per $100 of assessed valuation for the police and firemen's retirement fund for the fiscal year 1982–83 (the levy for 1981–82 having been $.31). The authorization for a levy of up to $.40 per $100 assessed valuation at an election in 1976, in my opinion, is sufficient as "approval of a majority of the qualified voters" so as to authorize the levy of as much as $.40 in any subsequent year.

The "Hancock Amendment" has the effect of limiting the authority of legislative bodies at the state and local level in the performance of their historic "ways and means" function. The people by amending the Constitution of course have the power to withhold authority from their elected representatives, but an amendment which modifies the traditional balance of governmental power should be construed with some strictness. This does not mean that plain language should not be given full effect. It means, rather, that the language should not be enlarged beyond its express terms in an attempt to serve some assumed purpose which the draftsmen may have had in mind. It is also reasonable to assume that the people intended that other laws remain in place and that existing governmental functions continue as previously authorized by the Constitution and the statutes.

It is said that constitutional provisions are to be given a broader construction than statutes because of their enduring nature. *Boone County Court v. State,* 631 S.W.2d 321, 324 (Mo. banc 1982); *Roberts v. McNary,* 636 S.W.2d 332, 335 (Mo. banc 1982). I can accept this proposition, but only if it is applied to the entire text of the Constitution, rather than separately to the amendments. The 1980 amendments were grafted onto an existing structure. The language should be read in the context of the existing constitutional provisions which were left unchanged. The effort should be to give effect to the entire text, to harmonize the new and the extant, and to disturb the basic structure of government or impede the functioning of government only where the command is clear. The approach of *Oswald v. City of Blue Springs,* 635 S.W.2d 332 (Mo. banc 1982) is a sound one.

The courts, construing the language of the amendment, should give effect to the words used according to their plain meaning. This Court so states in *Boone County,* 631 S.W.2d at 324. The material inquiry, furthermore, is not as to what the draftsmen intended, but as to what was made manifest to the voters. *Boone County,* 631 S.W.2d at 324, n. 2; *Roberts, supra.*

Counsel have supplied us with the text of the Hancock Amendment using boldface and brackets to show the modifications the draftsmen made in the so-called Headlee Amendment, enacted earlier in Michigan by the initiative process. I find this form of presentation unhelpful and confusing. It is asserted that the Missouri drafters sought to close some of the "loopholes" which the Michigan draftsmen, by design or inadvertence, had allowed into the text. It is then

claimed that a comparison with the Michigan enactment will more perfectly demonstrate the intent of the voters of Missouri. The argument is not appropriate. The Missouri voters speak through the language that was before them. If the Missouri draftsmen have tried to "tighten up" the Michigan version and have succeeded, then resort to the Michigan text is unnecessary. To the extent that they have failed, a look at an earlier and possibly looser version cannot help them. The Missouri amendment must be construed within its four corners.

Nor is it appropriate to place pages of newspaper clippings and editorials in evidence, or to append them to the briefs. There is no guarantee that any single news story or editorial reached any particular segment of the voters. The reporters and editors are not expert in statutory construction. Proponents may make extravagant claims, or try to soothe expressed fears. Those in opposition may make dire predictions about the application and effect, or may indulge in wishful thinking about the meaning of restrictions. None of these expressions can be helpful to us. To the extent that the text of the amendment is clear, extraneous considerations are not necessary. If the text is not explicit, then it should not be read as impinging upon the normal incidents of representative government.

Whatever the situation might be as to "legislative history" of an enactment of the General Assembly, our courts have not been willing to receive campaign material or news accounts as aids to the construction of matters submitted to the voters by initiative and referendum. *Household Finance Corp. v. Shaffner,* 356 Mo. 808, 203 S.W.2d 734 (banc 1947); *State ex rel. Russell v. State Highway Commission,* 328 Mo. 942, 42 S.W.2d 196 (Mo. banc 1931); *Missourians for Honest Elections v. Missouri Elections Commission,* 536 S.W.2d 766 (Mo.App.1976). This is as it should be. The drafters of the initiative do not have the committee procedures and the opportunity for open exchange of ideas which are characteristic of the legislative process, and the voters are not privy to the intentions and discussions of the framers. The proponents of initiative are strictly bound by the terms they submit to the voters.

It is not even appropriate to rely on the ballot title. The title is supplied by the Attorney General for the convenience of the voters, § 126.081, RSMo 1978, *superseded by* § 116.160, RSMo Supp.1981. It is not a part of the initiative petition for which the proponents have sought to collect signatures. The Attorney General's opinion is simply the opinion of a lawyer, and it is not effective to make or to declare the law. *Gershman Investment Corporation v. Danforth,* 517 S.W.2d 33 (Mo. banc 1974). The Attorney General's phrasing is subject to the scrutiny of the Circuit Court of Cole County, which may modify or revise it, but the court in exercising this function is not performing a judicial act subject to the normal processes of appellate review. *United Labor Committee, Inc. v. Ashcroft,* 572 S.W.2d 446 (Mo. banc 1978). The Circuit Court simply serves as a check on the Attorney General. Under these circumstances the title supplied by the Attorney General, whether or not modified by the Circuit Court, cannot have the least effect in altering the text of the proposal and, if there is any conflict, the text must prevail. This is so even though the overwhelming majority of the voters probably rely on the title and do not avail themselves of the means available for studying the actual text. Those who rely on the title, on propaganda for or against the initiative, or on media reports must nevertheless be taken to have agreed to the language of the proposal, but to nothing else. The case of *Rathjen v. Reorganized School District R–2 of Shelby County,* 365 Mo. 518, 284 S.W.2d 516, 524 (Mo. banc 1955), does not support a claim that the ballot title may be used in construing an initiative measure because that case involved an amendment proposed by the General Assembly and the title was an integral part of the legislative submission.

What, then, does the plain language of the amendment yield? The cities try to

save their levies by arguing that each year's property tax is a new tax, expressly authorized by existing law. They say that the first portion of Article X, Sec. 22(a), relating to taxes not previously authorized, applies, and contend that Section 11(b) supplies the authority. In support of this argument they point to § 67.110, RSMo Supp. 1981, which provides that a municipality loses the right to levy a tax on real property for the ensuing year, except for debt service, if it fails to adopt a levy by a certain date. This rather technical argument is contrary to the plain meaning of the language used in Sec. 22(a), and furthermore depends on a statute rather than on the Constitution. The phrase, "current levy" in the second clause of 22(a) seems very clear. It means the levy in effect on the date the amendment was adopted. Had there been a purpose of authorizing a levy up to the full constitutional limit of 11(b) it would have been easy to make this claim by using a phrase such as "constitutional limit," or "authorized levy." The current levy of the property tax, then, may not be increased without the approval of the voters. The result may be frustrating to the conscientious public stewards who had not levied up to the full constitutional authorization, but the language admits of no alternative.

Both sides cite *Roberts v. McNary, supra,* in which case, incidentally, the testimony of the purported draftsman as to what *he* intended was rejected as an aid to construction. The decision supports the judgment of the trial court, not appellants' position. Appellant relies on the statement found in *Roberts,* 636 S.W.2d at 337, that the amendment "does not affect any license or fee specific in amount which, although authorized at the time of the adoption of the Hancock Amendment, had not yet actually been imposed." I take this to refer to a situation in which *all* required legislative action necessary to assess a fee in a fixed amount had been taken, with only the effective date deferred, and not to the variable authorization of Art. X, Sec. 11(b). This case could help appellants, furthermore, only if we had accepted the argument that each year's levy is a new tax.

Section 22(a), however, is silent as to when the voter approval must be given. The voters of University City, in 1976, authorized the City Council to levy up to $.40 per $100 of assessed valuation for police and firemen's pensions. They did so under express constitutional authority (Art. VI, Sec. 25) empowering the General Assembly to authorize local governmental units to establish pension programs and under a statute specifying the procedure to be used by cities of less than 100,000 population which wanted to do so. (Sec. 86.583, RSMo 1978). I believe that 22(a) should be read in conjunction with the constitutional and statutory provisions just mentioned. The manifest intent of the voters of University City in adopting the 1976 ordinance (which simply increased the prior authorization) was to establish and maintain an adequately financed pension plan. The 1980 amendment should not be read in a manner which might jeopardize this purpose, and which might also interfere with the city's commitments to its present and prospective pensioners, unless the language is compelling. Cf. *Oswald v. City of Blue Springs, supra.* I do not find the compulsion. I doubt very much that the draftsmen even considered this problem. The city authorities should be entitled to rely on the 1976 authorization, and they and the beneficiaries should not be penalized on account of their past moderation in not levying the full amount authorized.

In expressing these views, I give consideration to Article X, Sec. 24(a), which was added by the 1980 amendment, and which reads as follows:

The provisions for voter approval contained in [the 1980 amendment] do not abrogate and are in addition to other provisions of the constitution requiring voter approval to incur bonded indebtedness and to authorize certain taxes.

A superficial reading of this provision might lead one to believe that an election is required to increase the current levy for pension purposes over and above that previously authorized by the voters. By force of the majority holding in this case, however,

the 1982–83 levy for police and firemen's pensions is not a "new tax." I agree with the majority on this point. The levy, furthermore, has nothing to do with bonded indebtedness. Section 24(a), therefore, is supportive of the position I expound, rather than looming as an obstacle.

It might be argued in defense of the entire University City levy that the voters expressed themselves in support of the permission and limitations set out in Section 11(b) when they voted on the Constitution of 1945 and intervening amendments. I would not go this far. The sense of 22(a) is that any particular authorization must have the specific approval of the voters. The tax for police and firemen's pensions has this particular approval; the general and library levies do not. Cf. *Roberts v. McNary,* 636 S.W.2d at 336.

I would reverse the judgment in No. 64863 to the extent that it invalidates the increase in the levy for police and firemen's pension funds for 1982–83, over the levy in effect for 1981–82. I would affirm that judgment in all other respects and would affirm the judgment in No. 64862.