**ARBOR INVESTMENT COMPANY, LLC, et al., Appellants,**

v.

**CITY OF HERMANN, Respondent.**

No. SC 91109.

Supreme Court of Missouri, En Banc.

May 31, 2011.

Rehearing Denied July 19, 2011.

James E. Mello, Jeffery T. McPherson, Thomas B. Weaver, Armstrong Teasdale LLP, St. Louis, for Arbor.

Kenneth Heinz, Edward J. Sluys, Carl L. Lumley, Curtis, Heinz, Garrett & O'Keefe PC, Clayton, David P. Politte, Zick, Voss & Politte, Washington, MO, for City.

State Solicitor James R. Layton, Attorney General's Office, Jefferson City, for State Attorney General's and State Auditor's Offices which filed briefs as friends of the Court.

Daniel G. Vogel, Erin P. Steele, Paul V. Rost, Cunningham, Vogel & Rost PC, St. Louis, for Missouri Municipal League which filed a brief as a friend of the Court.

Howard C. Wright, Jr., Douglas L. Healy, Healy & Healy, Springfield, for Missouri Public Utility Alliance, Missouri Joint Municipal Electric Utility Commission and Municipal Gas Commission which filed briefs as friends of the Court.

LAURA DENVIR STITH, Judge.

Arbor Investment Company LLC, CFV Plastics LLC, Buzz Manley and Donna Austin (collectively, "Arbor") appeal from the entry of summary judgment in favor of the city of Hermann in Arbor's action for damages, an injunction and a declaratory judgment stemming from Hermann's alleged violation of the Hancock Amendment. Arbor argues that the trial court erred in ruling that, under what is sometimes referred to as the "five-factor test" set out in footnote 10 of *Keller v. Marion County Ambulance District,* 820 S.W.2d 301 (Mo. banc 1991), Hermann's utility charges are a fee rather than a hidden tax and, therefore, do not run afoul of the Hancock Amendment, *Mo Const. art. X, sec. 22(a).*

For the reasons set out below, this Court finds that four of the *Keller* factors favor finding that the utility service charges are fees for services, not taxes, and the final factor favors finding that the charges are a tax. The trial court did not err in holding that, under *Keller,* the utility charges are user fees, not taxes.

Arbor alternatively argues this Court should reject the five *Keller* factors as the relevant test and should find that the utility service charges are taxes, not fees, because Hermann is the sole provider of these utilities. It says this fact is dispositive, at least when the issue is not the initial establishment of a service but the raising of rates for that service. This Court declines Arbor's invitation. *Keller* itself involved raising the rate for existing ambulance services. Here, as there, the *Keller* factors provide useful and usually determinative criteria for gauging whether a charge is a fee or a tax. Moreover, those criteria already permit consideration of the fact that Hermann is the sole provider of the services in question; indeed, that was true in *Keller.*

To the extent that cases such as *Missouri Growth Association v. Metropolitan St. Louis Sewer District,* 941 S.W.2d 615 (Mo.App.1997), suggested that only the five *Keller* factors can be considered, however, this Court agrees that they have overread *Keller. Keller* lists these factors as useful aids, which they are. But the post-*Keller* decision by this Court in *Beatty v. Metropolitan St. Louis Sewer District,* 867 S.W.2d 217 (Mo. banc 1993), itself considered other relevant facts in making the ultimate determination of whether a charge nominally called a "user fee" really was a hidden tax when it found the application of the *Keller* factors inconclusive. Here, however, the five *Keller* factors clearly demonstrate that the charges are user fees for the provision of utility services, not taxes.

Arbor's real objection is that it thinks that the rates Hermann charges for its utility services are too high, noting that a report of the state auditor for the year 2003 showed that approximately 10 per-

cent of utility revenues were transferred to the city's general fund account in the form of a gross receipts tax or surcharge and the city transferred substantial but varying additional sums from 2000 to 2006 to city general accounts, principally from city electric utility accounts.

But it was the utilities themselves, not their customers, who paid the gross receipts charges. Moreover, Arbor concedes in its brief that all the accounts are city accounts and that there is no law barring such transfers. It uses the transfers only to show that the charges were in excess of costs to run the utility and argues this is improper because the city is the only provider of these services. Again, however, Arbor cites no authority to support this assertion. To the contrary, in *Pace v. City of Hannibal*, 680 S.W.2d 944, 948 (Mo. banc 1984), this Court recognized a municipality's right to recover overhead, wear and tear, and related city expenses caused by the utility as well as revenue lost when the municipality took over the running of the utility, without turning the charge into a tax.

*Keller* itself involved an ambulance service that raised its rates substantially beyond the costs of actually providing the service, in some instances doubling its charges. Although there, too, it was the sole provider of most ambulance services, *Keller* rejected the argument that this made the charge a tax, stating that "how much to charge users is for those elected to run the organization" and that if bad decisions are made, then the voters can turn the decision-makers out of office. 820 S.W.2d at 304.

While in a particular case the excess charge may be so substantial that it no longer can be considered a fee for service, because it does not bear a reasonable relationship to the services provided under *Keller* factor number 4, there is no such evidence here. Accordingly, the judgment is affirmed.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

The controlling facts are not in dispute. Hermann is the exclusive provider of utility services for electricity, natural gas, public water and sewer, and refuse in Hermann. Hermann established natural gas lines in 1966; prior to this, there was no natural gas service in the city. Hermann has provided exclusive electric service to its citizens since 1958, public water and sewer service since the 1940s, and exclusive trash or refuse service for at least the last 30 years.

On December 29, 2006, Arbor filed this action, later certified as a class action, against Hermann. Arbor's petition alleged that Hermann was imposing utility charges that were grossly in excess of its costs of providing the services and moving over a portion of the resulting revenue from the city's utility accounts into the city's general fund account to help finance non-utility-related city operations. It alleged that this makes the utility charges a hidden tax and, so, violates article X, section 22(a) of the Missouri Constitution, which requires a vote of the people before taxes can be increased. Article X, section 22(a) is part of a group of constitutional provisions commonly known as the "Hancock Amendment."[2]

The plaintiffs own property in Hermann, are utility customers and, for several

1. The Court expresses its appreciation to the Honorable Stephen K. Willcox for taking part in oral argument and for his contributions to resolution of this case while serving as a special judge of the Court.

2. The Hancock Amendment comprises sections 16 through 24 of article X of the Missouri Constitution. The amendment owes its namesake to its chief proponent, former state legislator Mel Hancock. *Rhonda C. Thomas, The Hancock Amendment: The Limits Imposed on Local Governments*, 52 U.M.K.C. L.Rev. 22, 23 (1983). Mr. Hancock initiated the statewide petition drive that culminated in the amendment being placed on the Novem-

years, have paid one or more of Hermann's utility charges for gas, electricity, water and sewer, and refuse or waste. Since November 4, 1980, the city has increased its utility rates numerous times without a vote of the people. If a resident fails to pay for gas, electricity or other city-provided utility services, then, like a private utility service provider, Hermann may shut off that customer's utility services. There is no evidence in the record that Hermann has authority to place a lien on a non-paying customer's property for non-payment of utility charges, as is customary for non-payment of property taxes.

Arbor notes that Hermann charges in excess of the costs of providing utility services. For 2003, the state auditor issued a report finding that, in the aggregate, Hermann transfers hundreds of thousands of dollars of this excess from its utility accounts to its general fund accounts. This includes a quarterly 10–percent gross receipts tax or gross receipts surcharge that the water and sewer, electric, and gas utilities themselves paid on their own gross receipts, as well as additional substantial sums transferred principally from the charges collected from electric utility customers, but to a lesser degree from some other utility customers also in vary-

ing amounts.[3] In addition, beginning in approximately 2003, the city has imposed a quarterly "communications fee" on some utility accounts to defray the cost of constructing and operating a 911 call center. The center provides 911 service to residents of the city, including Hermann utilities customers.

There is no claim that Hermann's transfer of any of these funds was improper *per se*. To the contrary, Arbor noted in its motion for summary judgment and concedes here that all the funds involved are city funds and that Hermann was entitled to make these internal transfers of city monies. Arbor's claim is based on its assertion that these transfers and charges are evidence of excessive utility fees. It argues that to the extent that utility charges exceed the comparable charge at the time the Hancock Amendment was adopted, they should have been submitted for a vote of the people but were not. Arbor's petition is not entirely specific as to the period covered, but it appears to seek recovery of unstated damages for the charges made by the of utilities in violation of the Hancock Amendment for the years 2000 to the date of suit in 2006, as well as injunctive and declaratory judgment relief and attorney's fees under the Hancock

---

ber 4, 1980, general election ballot, when it was adopted by voters. *Id.*

3. The gross receipts taxes and surcharges on the electric utility were authorized by Hermann ordinances 680 and 681, which both were passed before the Hancock Amendment became effective November 4, 1980. Hermann lowered the gross receipts tax on electricity to 5 percent in 1982 and then raised it to 10 percent in 1994. The city removed its natural gas gross receipts surcharge in 1977 but reimposed it in 2002. As just noted, these fees are on the utilities, not on the customers, and, therefore, do not support Arbor's claims that rates charged to customers were raised excessively. In addition, prior case law has approved a municipal utility making a charge

above costs to cover its lost profits and increased overhead due to running a municipal utility, and there is no showing or attempted showing that the charges here are in excess of those reasonable for that purpose. *Pace v. City of Hannibal*, 680 S.W.2d 944, 948 (Mo. banc 1984). Finally, Arbor has cited no authority for its assertion that the fact that gross receipts charges have been lowered and then raised since 1980 has any relevance to the validity of those charges where they are not in excess of the actual levy in effect when the Hancock Amendment was passed in 1980. *See Wenzlaff v. Lawton*, 653 S.W.2d 215, 216 (Mo. banc 1983) (Hancock Amendment implicated when the current levy of a tax exceeds its actual levy in effect at time Hancock Amendment was adopted).

Amendment's enforcement provision, article X, section 23.

After discovery and certification of the plaintiff class, both parties filed cross-motions for summary judgment in which they alleged that the uncontroverted facts supported summary judgment in their respective favors.[4] The trial court granted Hermann's motion for summary judgment based on its determination that factors 1, 2, 3 and 4 of the *Keller* test favored a finding that the charges were fees, not a tax, and that, therefore, the utility charges were not subject to the Hancock Amendment. Arbor appealed. After decision by the court of appeals, this Court granted transfer. *Mo. Const. art V, sec. 10.*

## II. STANDARD OF REVIEW

■ This Court's review on an appeal from summary judgment "is essentially *de novo.*" *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). Summary judgment is proper only if the moving party establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Rule 74.04(c)(6).* This Court will review the record in the light most favorable to the party against whom judgment was entered and accords the non-movant the benefit of all reasonable inferences from the record. *ITT Commercial Fin. Corp.*, 854 S.W.2d at 376.

## III. THE UTILITY FEES IMPOSED BY HERMANN ARE NOT SHOWN TO VIOLATE THE HANCOCK AMENDMENT

### A. History of Hancock Amendment Jurisprudence

Arbor argues that the utility charges at issue in this case were not user fees paid in exchange for services. As noted, Arbor concedes that there is no impropriety in transferring money from one city account to another. It argues, however, that the fact that the utilities have sufficient funds to make these transfers and that they collect the gross receipts charges and the communications fees show that the charges made by the utilities are more than user fees and should be held to constitute hidden taxes. Alternatively, even if they are fees rather than taxes, Arbor contends, they should be found to run afoul of the Hancock Amendment, specifically, article X, section 22(a) of the Missouri Constitution, because they can be used by the city to help defray customary governmental expenditures without a public vote.

*1. Keller Clarifies that the Hancock Amendment Bars Only Increases in Taxes, Not Increases in User Fees, without a Public Vote*

Article X, section 22(a) provides:

Counties and other political subdivisions are hereby prohibited ... from increasing the current levy of an existing tax, license or fees ... without the approval of the required majority of the qualified voters of that ... political subdivision voting thereon.

In *Roberts v. McNary*, 636 S.W.2d 332, 336 (Mo. banc 1982), this Court initially interpreted the "tax, license or fees" language of section 22(a) to include virtually any pecuniary exaction by a political subdivision. *Keller* overruled this aspect of

---

4. Arbor's summary judgment motion was a partial motion because it requested that Arbor's claim for attorney's fees be resolved on a future date. In addition, Arbor argued that it would need additional information to deter-

mine the exact amount of charges over cost for particular years and utilities, if its motion for partial summary judgment were granted and that of Hermann were overruled.

*Roberts* and held that raising fees paid for municipally provided services or goods do not need to be submitted to the voters each time they are raised, because revenue measures that operate to compensate a political subdivision for benefits supplied are not taxes and do not run afoul of section 22(a). 820 S.W.2d at 305.

*Keller* itself provides a good example of this distinction between user fees and taxes. The *Keller* plaintiffs challenged the constitutional validity under section 22(a) of an increase in the schedule of charges imposed by a county ambulance district for actual ambulance services rendered. *Id.* at 302. The evidence showed that prior to the increase, the ambulance district charges were sufficient to cover its expenses, but that it nonetheless increased its charges by 25 percent to 100 percent for various services. *Id.* at 310 (Holstein, J., dissenting). Plaintiffs objected to this increase, arguing that the increase in the revised schedule of charges should have been submitted to the voters for approval under the Hancock Amendment. *Id.* at 302 (principal opinion).

*Keller* took up the task of ascertaining the meaning of section 22(a) in light of its context and the voters' intent. *Id.* at 303. In examining the portion of section 22(a) of the Hancock Amendment requiring a vote of the people for an increase in a "tax, license or fees," *Keller* remarked:

> If the people of Missouri intended to prohibit localities from increasing *any* source of revenue without voter approval, a general term like "revenue" or "revenue increase" could have been used. Instead, the people of Missouri characterized "fees" in § 22(a) as an alternative to a "tax." This characterization suggests that what is prohibited are fee increases that are taxes in everything but name. What is allowed are

fee increases which are "general and special revenues" but not a "tax."

*Id.* *Keller* found additional support for this interpretation in the use of the word "levy" in section 22(a) because "[i]n ordinary usage, a tax is levied, but a fee is charged" and "a 'fee' can only be levied if the 'fee' is actually a tax." *Id.*

*Keller* then addressed the history and logic of the Hancock Amendment. It determined that the Hancock Amendment was designed only to limit non-voter-approved increases in taxes. It was not intended to replace traditional methods of controlling other increases in charges or revenue received by municipalities or quasi-governmental organizations such as the ambulance district. In this regard, "the Hancock Amendment, in order to keep the public burden of taxation under control, does not prohibit these organizations from shifting the burden to the private users of these services." *Id.* at 304.

To assist future courts in analyzing whether a charge is a user fee that is within the discretion of the public entity to increase, or instead is a tax that must be submitted to the voters before being increased, *Keller* set forth five factors that courts should consider:

> 1) When is the fee paid?—Fees subject to the Hancock Amendment are likely due to be paid on a periodic basis while fees not subject to the Hancock Amendment are likely due to be paid only on or after provision of a good or service to the individual paying the fee.

> 2) Who pays the fee?—A fee subject to the Hancock Amendment is likely to be blanket-billed to all or almost all of the residents of the political subdivision while a fee not subject to the Hancock Amendment is likely to be charged only to those who actually use the good or service for which the fee is charged.

3) Is the amount of the fee to be paid affected by the level of goods or services provided to the fee payer?—Fees subject to the Hancock Amendment are less likely to be dependent on the level of goods or services provided to the fee payer while fees not subject to the Hancock Amendment are likely to be dependent on the level of goods or services provided to the fee payer.

4) Is the government providing a service or good?—If the government is providing a good or a service, or permission to use government property, the fee is less likely to be subject to the Hancock Amendment. If there is no good or service being provided, or someone unconnected with the government is providing the good or service, then any charge required by and paid to a local government is probably subject to the Hancock Amendment.

5) Has the activity historically and exclusively been provided by the government?—If the government has historically and exclusively provided the good, service, permission or activity, the fee is likely subject to the Hancock Amendment. If the government has not historically and exclusively provided the good, service, permission or activity, then any charge is probably not subject to the Hancock Amendment.

*Id.* at 304 n. 10.

*Keller* cautioned, however, that the above criteria are merely "helpful in examining charges denominated as something other than a tax. No specific criterion is independently controlling; but, rather, the criteria together determine whether the charge is closer to being a 'true' user fee or a tax denominated as a fee." *Id.* In so determining, *Keller* said courts should be guided by the fact that:

The phrase 'license or fees' in § 22 indicates an intent to prevent political subdi-

visions from circumventing the Hancock Amendment by labeling a tax increase as a license or fee.... This language requires courts to examine the substance of a charge, in accordance with this opinion, to determine if it is a tax without regard to the label of the charge.

*Id.* at 305.

*Keller* reasoned that, based on the above criteria, "property taxes, sales taxes, franchise taxes, and income taxes, among others, are subject to the Hancock Amendment." *Id.* Although *Keller* did not detail its application of each of the five factors to the *Keller* facts, at various points in the opinion it found that the fees were charged only when services were provided and charged to those receiving them, not the general public; that the fees were for a service and their amount varied under a set schedule depending on the service provided; and that ambulance services are a type of service that often is privately provided but that a municipality may provide when private services are not present or are inadequate. *Id.* at 302, 304. Consideration of these facts favored finding that the charges were a fee not a tax, and *Keller* so held, stating that "this Court holds that increases in the specific charges for services actually provided by an ambulance district are not subject to the Hancock Amendment." *Id.* at 305.

In so holding, *Keller* rejected the *Keller* dissent's argument that the Hancock Amendment prohibited increases in fees by political subdivisions in every case without restriction and that requiring voter approval of all user fee increases was "not necessarily a bad policy." *Id.* at 310 (Holstein, J., dissenting). Rather, the *Keller* majority stated, courts are not in the business of setting utility rates, for "How much to charge users is for those elected to run the organizations. *If the decisions*

*are unpopular, the directors may be voted out of office. The only requirement placed on the directors by the Hancock Amendment is that any increase in taxes must be approved by the voters." Id.* at 304 (emphasis added).

2. *Post-Keller Decisions Continue to Apply the Keller Factors and Analysis*

A few years after *Keller* was decided, this Court again addressed section 22(a) in *Beatty v. Metropolitan St. Louis Sewer District*, 867 S.W.2d 217 (Mo. banc 1993). At issue in *Beatty* were wastewater charges imposed by the Metropolitan St. Louis Sewer District, a governmental entity overseen by an appointed six-member board of trustees that was authorized to impose ad valorem taxes and establish charges for sewer services. *Id.* at 218. *Beatty* made clear that, in place of *Roberts'* holding that literally any fee increase should be considered a tax increase and, thus, subject to the Hancock Amendment, *Keller* had "*suggested* a five-pronged analysis" to "*assist* in determining whether a governmental charge is a tax within the meaning of Article X, Section 22(a), or user fee not subject to constitutional controls." *Id.* at 220 (emphasis added).

In applying the first *Keller* factor ("When is the fee paid?"), *Beatty* remarked that the "question posed there is not whether the political subdivision provides a service but the regularity with which the fee is paid." *Id.* ("the first *Keller* test concerns itself only with timing"). *Beatty* resolved the first *Keller* factor in favor of appellants because the fee was imposed and paid on a periodic basis.

With respect to the second factor ("Who pays the fee?"), *Beatty* concluded that this consideration favored MSD because "[w]hile it is true that almost all residents of the district pay the charge, it is also true that only those persons who actually use MSD's services pay the charge." *Id.*

*Beatty* resolved the third factor ("Is the amount of the fee to be paid affected by the level of goods or services provided to the fee payer?") in favor of the appellants because the vast majority of the sewer charges were uniform among all users whereas "for a governmental charge to appear to be a user fee under *Keller's* third criteria, the charge imposed must bear a direct relationship to the level of services a 'fee payer' actually receives from the political subdivision." *Id.* at 221.

As to the fourth *Keller* factor ("Is the government providing a service or good?"), *Beatty* found that MSD prevailed because it clearly provided a service in return for a direct benefit. Finally, *Beatty* concluded the fifth *Keller* factor was inconclusive "given the mix of public and private entities that have supplied sewer service historically." *Id.*

As such, the five *Keller* factors in *Beatty* were inconclusive, with two supporting each side and one neutral. *Beatty sub silentio* identified a sixth factor, stating that its uncertainty as to which party the five *Keller* factors favored was "heightened by the fact that unpaid sewer charges trigger a lien against real property by operation of law." *Id.*

To resolve the uncertainty resulting from the fact that the *Keller* factors that did not point clearly in favor of or against finding that the charges were a tax, *Beatty* held that ties go to the taxpayer, stating that where "genuine doubt exists as to the nature of the charge imposed by local government, we resolve our uncertainty in favor of the voter's right to exercise the guarantees they provided for themselves in the constitution." [5] *Id.*

5. Since *Keller* and *Beatty,* this Court has ex- plored the proscription set forth in section

### 3. The Keller Factors Provide an Aid in Distinguishing a User Fee From a Hidden Tax

■ This Court derives several lessons from the discussions in *Keller* and *Beatty*. First, it is axiomatic that the Hancock Amendment is intended to prohibit municipal fee increases that are taxes in everything but name; true user fees simply are not subject to section 22(a). Indeed, Arbor's brief itself recognizes that it would be unworkable to require the voters to determine whether a city snack stand can increase its charges for food when its own food service cost rises, or whether other true user fees can be increased in response to the increased price of gasoline, and agrees that such increases are not and should not be required to be submitted to the voters under section 22(a).

But, Arbor says, even if this means utility charges otherwise would be true user fees, they should be treated differently and increases in them be made subject to the Hancock Amendment because the city has a monopoly on utility services. At another point, it suggests that the *Keller* factors should apply only to a new fee for service, and not for an increase in such a fee.

■ These attempted distinctions fly in the face of *Keller* and the Hancock Amendment itself. As *Keller* held, the Hancock Amendment is intended to preclude an increase in taxes, including taxes masquerading as fees, without a public vote. This Court must decide the questions before it based on this law, not on what is argued to be a better policy. Nothing in the text of the amendment or in this Court's prior cases would permit treating as taxes any increase in fees, or at least doing so if a municipality is the sole provider of the services in question, while considering newly imposed fees, at least if those fees are for non-exclusive services, actually to be fees.[6] User fees are not taxes and are not subject to the Hancock Amendment.

■ Second, while the five factors set out in *Keller*'s footnote 10 are those this Court believes are most likely to assist courts in determining the tax versus fee issue, they are not intended to be exhaustive. *Keller* itself cautioned that the factors are "helpful," but that no one criteria is controlling and that evaluating the "criteria together" can determine whether a charge is "closer" to a true user fee or a tax. 820 S.W.2d at 304 n. 10.

In other words, consideration of the *Keller* factors is a necessary step, but the purpose of their use is not because an arithmetic score will be determined that decides whether the particular charges in question pass or fail but rather is to assist the courts in determining the ultimate issue of whether the charge is a user fee or a disguised tax.[7]

---

22(a) only once, in *Feese v. City of Lake Ozark*, 893 S.W.2d 810 (Mo. banc 1995). *Feese*'s facts were nearly identical to those of *Beatty* except that in *Feese* the city assessed sewer charges against even property not connected to the sewer system, and, therefore, not receiving any service. As *Feese* noted, this additional fact militated more strongly in favor of the taxpayer under the second *Keller* prong. *Id.* at 812. *Feese* found the sewer services to be taxes subject to the Hancock Amendment.

6. For these reasons, this Court rejects the attorney general's similar suggestion as ami-cus curiae that where a municipality is the sole provider of utility service, an increase should be considered a tax but if there are other providers it should be considered a fee, even though the city is providing the same service in both instances, and even though this would make the service move back and forth from tax to fee to tax as other providers entered or left the market.

7. This understanding of *Keller* is bolstered further by *Beatty*'s reference to the *Keller* factors as "suggested" to "assist" in determining whether a charge is a tax, license or fee

For these reasons, while a court should first consider the five *Keller* factors and while in most cases they will be dispositive, when the balance is a close one other factors also may need to be considered. In *Beatty*, that included the fact that any unpaid charges became a lien on the estate, making the charges more in the nature of taxes than fees.

### B. Application of the Law to the Facts of This Case

With the foregoing discussion in mind, this Court turns to the task of examining the substance of Hermann's utility rates, without regard to their labels, to determine whether they are taxes requiring approval of the voters pursuant to section 22(a).

It is undisputed that Hermann has increased its utility fees since November 4, 1980, without a vote of the people. Pointing to the 10–percent gross receipts charges imposed on the water and sewer, electric, and natural gas accounts,[8] the communications fees, and the considerable transfer of money from Hermann's electricity fund to its general fund, as well as the fact that Hermann is the only provider of these utility services, Arbor argues that Hermann's utility fees are taxes.

 The gross receipts surcharge and taxes are not paid by utility customers at all. They are paid by the utilities themselves as a charge on their gross receipts.

As this Court noted in *Pace v. City of Hannibal*, 680 S.W.2d 944 (Mo. banc 1984),[9] in rejecting a contention that a 5½ percent gross receipts payment in lieu of taxes by a Hannibal utility should have been reduced when the utility increased rates so that the total collected remained the same, such payments bear "no similarity to the user fees considered [and found to really be taxes] in *Roberts* because the 5½ percent factor is not charged against the users." *Id.* at 948. *Pace* further held specifically that percentage charges on receipts were not improper and:

> were it not for the payments in lieu of franchise tax [that Hannibal otherwise would collect from a privately owned utility] it would be appropriate for the city to levy a charge against the Board of Public Utilities for the fair value of the use of public property, including provision for maintenance and repair on account of wear, tear and damage attributable to the utility.

*Id.* Plaintiffs cite no cases holding that such gross receipts charges should be treated as if they were imposed on city residents rather than on the utilities themselves, nor does it provide any other basis to distinguish *Pace*. As in *Pace*, therefore, this Court finds that the charge to the utilities themselves of a gross receipts surcharge or tax is not a charge against the users and hence is not subject to the Han-

within the meaning of section 22(a) and by *Beatty's* own consideration of the impact on the analysis of two additional factors when the five *Keller* factors did not lead to a definitive answer—in *Beatty* these were the fact that failure to pay the sewer charge triggered a lien and reliance on the tiebreaking mechanism that resolution of doubt will be made in favor of the taxpayers. 867 S.W.2d at 221.

8. Although the specifics of how much money was transferred from each account do not affect the analysis directly, the Court notes

that for the year for which the most detailed information is available, 2003, about two-thirds of the gross-receipts proceeds were derived from the electric utility, and the majority of the remainder of the gross receipts revenues was derived from the gas utility receipts.

9. Although *Pace* was decided before *Keller* and ostensibly was operating under the literal reading of section 22(a) set forth in *Roberts*, *Pace* is still good law as it was cited with approval in *Keller*. *Keller*, 820 S.W.2d at 305.

cock Amendment on the grounds asserted by plaintiffs here.[10]

Utility customers are required to pay the user fees that generate the varying other sums over cost that the electric utility, and to a far more limited extent (at least insofar as the record shows) the other utilities, transfer from their utility accounts to the city's general account, and it is to those funds that this Court turns. The analysis begins by applying the *Keller* factors. The first inquiry is "When is the fee paid?" "Fees subject to the Hancock Amendment are likely due to be paid on a periodic basis while fees not subject to the Hancock Amendment are likely due to be paid only on or after provision of a good or service to the individual paying the fee." *Keller*, 820 S.W.2d at 304 n. 10.

Here, as in *Beatty*, the evidence in the record is that Hermann's utility fees are paid at periodic monthly intervals. But, as in *Keller*, those bills are sent out only for service that already has been provided by the time the bill is sent.[11] On similar facts, *Missouri Growth Association v. Metropolitan St. Louis Sewer District*, 941 S.W.2d 615, 623 (Mo.App.1997), held that while bills for sewer service were billed periodically, "payment is due 'only on or after provision of a good or service,' making it more like a user fee than a tax." Similarly, here, the trial court found this factor favors Hermann. This finding was not in error.

The second *Keller* prong is "Who pays the fee?" "A fee subject to the Hancock Amendment is likely to be blanket-billed to all or almost all of the residents of the political subdivision while a fee not subject to the Hancock Amendment is likely to be charged only to those who actually use the good or service for which the fee is charged." *Keller*, 820 S.W.2d at 304 n. 10.

Here, the evidence is that those few residents not receiving any services to their properties do not pay any utility fees, that only those who receive natural gas service are charged for it, that only those who receive electric service are charged for it, and so forth. Although most residents receive most of these services and so most residents pay these fees, *Beatty* held that this is the natural result of the fact that most residents receive the provided service and militates in favor of the municipality. *Beatty*, 867 S.W.2d at 220. The trial court did not err in resolving this factor in favor of Hermann.

The third *Keller* factor is "Is the amount of the fee to be paid affected by the level of goods or services provided to the fee payer?" "Fees subject to the Hancock Amendment are less likely to be dependent on the level of goods or services provided to the fee payer while fees not subject to the Hancock Amendment are likely to be dependent on the level of

---

10. While the 2003 state auditor's report cited by Arbor suggests that, from an accounting viewpoint, Hermann should break down its costs for overhead, wear and tear on streets, provision of services to the utilities, and presumably reserves, repairs and other costs, the report nowhere suggests that utilizing a percentage charge is legally improper, and *Pace* clearly approves use of a percentage charge rather than undertaking the time-consuming task of breaking out individual costs on a yearly and inherently varying basis.

11. While *Beatty* stated that the first factor concerns itself "only with timing," it did not indicate an intent to change the first *Keller* factor, which requires that in determining timing a court consider both whether the fee is paid on a periodic basis and whether it is paid only after provision of a service. In *Beatty*, the fee was charged at a flat rate to all residential customers each quarter without regard to when the service was used, so long as sewer service was provided. 867 S.W.2d at 218. That contrasts with the facts of this case.

goods or services provided to the fee payer." *Keller,* 820 S.W.2d at 304 n. 10.

The evidence in the record shows that the amount of a customer's bill depends on the amount of electricity, gas and water used. Only the quarterly "communications fee" of $0.75 for 911 service that is added to some utility accounts appears to be a flat charge, and it is utilized to make emergency services available to all residents and businesses, including the utilities. The trial court properly resolved this factor in favor of Hermann.

The fourth *Keller* factor is "Is the government providing a service or good?" "If the government is providing a good or a service, or permission to use government property, the fee is less likely to be subject to the Hancock Amendment. If there is no good or service being provided, or someone unconnected with the government is providing the good or service, then any charge required by and paid to a local government is probably subject to the Hancock Amendment." *Id.* All parties agree that a service is being provided, although Arbor claims that the fee charged is disproportionate to the service given, as discussed further below. This factor therefore favors the city, as the trial court found.

The fifth *Keller* factor is "Has the activity historically and exclusively been provided by the government?" "If the government has historically and exclusively provided the good, service, permission or activity, the fee is likely subject to the Hancock Amendment. If the government has not historically and exclusively provided the good, service, permission or activity, then any charge is probably not subject to the Hancock Amendment." 820 S.W.2d at 304 n. 10.

*Beatty* and *Keller* seem to consider this factor in reference to whether the service is one provided by private versus public entities generally. *Keller* notes that many such organizations are "set up by governments to fulfill purposes inadequately served by private organizations. In addition to ambulance districts, other special districts with the power to tax and to charge for good and/or services include community health services, conservancy districts...." 820 S.W.2d at 304. *Beatty* found that sewer services may be provided from either public or private entities and found this an inconclusive factor. 867 S.W.2d at 221. Considered from this perspective, utility services provided by Hermann are the kinds of services that sometimes are provided by public and at other times by private entities, and this factor would be inconclusive.

The parties seem to analyze this factor in light of the historical provision of services in Hermann itself, however. Considered from this perspective, the evidence shows that with respect to natural gas, the city has been the exclusive and sole historic provider of that utility to Hermann customers since Hermann began natural gas service in 1966. For other utilities, Hermann has provided exclusive electricity service to its residents since 1958, but before that date the service was provided by a third party, Missouri Power & Light. Water and sewer services also were provided by different entities before the city took them over in the 1940s, and the same is true of trash and refuse services, which the city took over some 30 years ago or more. Accordingly, it cannot be said that all the utilities other than natural gas historically and exclusively were provided by Hermann.

On the other hand, Arbor notes that now that Hermann is providing these services, it has passed an ordinance prohibiting any other company from providing a competing service. As such, even if historically this service is one provided both by private and

public utilities and so this factor would be neutral, at this point it solely is available from the city. The exclusivity of service at the current time tilts this factor in favor of Arbor.

In sum, one *Keller* factor favors finding the fees a tax, and four favor finding the fees are, as labeled, fees. While no one factor is dispositive and different factors may have more or less importance in a particular case, such a heavy weighing of factors in favor of Hermann supports the trial court's determination that the charges are fees, not taxes. *Missouri Growth Association*, 941 S.W.2d at 624.

Looking at the additional factor considered in *Beatty*, even though not identified as a factor as such, further supports this result—whether failure to pay the fee results in a lien on the customer's property. In *Beatty*, it did. 867 S.W.2d at 221. Liens often attach to property when taxes go unpaid, so a municipal charge that results in a lien substantively looks more like a tax than a user fee.[12] By contrast, here, the result of failure to pay a city utility bill is that the service will be cut off, just as a private utility terminates service when payment is not made. In this regard, the substance of the municipal charge in this case more closely resembles a user fee than a tax as it results in a cutoff of utility service, not a lien.

This Court declines Arbor's and the attorney general's invitation to supplant the above analysis with one focused on whether a municipal utility is the sole provider of services and, if so, whether it is charging anything other than its precise cost of providing service. While being the sole entity providing service is relevant, it was a factor considered in *Keller* itself as often

being the motivating factor for a municipality to provide a utility service in the first instance—if the city did not do so, such services might not be made adequately available to its citizens, and *Beatty* explained that in that case, the metropolitan sewer district replaced prior disparate sewer services and became the sole provider of such services in the city and much of St. Louis county. It is simply a fact in the case of many municipal utilities that they will be the sole service provider, and *Keller* and *Beatty* do not suggest this fact should be given dispositive weight.

Rather, the unavailability of other sources of service is considered in the course of considering whether the service historically has been provided by private or public entities. To make this single factor dispositive would be inconsistent with *Keller* and inappropriately would elevate one factor above other relevant considerations. No case is cited that has held that the fact that a city is the sole provider of a particular type of utility means that the charge is a tax rather than a fee, and such a holding would be inconsistent with *Keller, Pace* and *Beatty*, in all of which it appears that the municipal or other public district in question was the sole provider of the service in question. Indeed, it illogically would make the decision whether the same charge is a fee or a tax vary depending on whether a particular municipality does or does not have a competitor, a status that well could change back and forth over time for any particular service.

Similarly, this Court rejects Arbor's suggestion that, irrespective of other criteria, any time a political subdivision charges a fee in excess of the cost of providing the service, no matter how slight that excess

---

12. *See, e.g., § 140.690, RSMo 2000* ("Real property is in all cases liable for all taxes due any city or incorporated town, and a lien is created in favor of the state of Missouri for all these taxes, and the interest and costs provided by law, the same as for state and county taxes, which lien shall be enforced as in this chapter provided").

might be, it becomes a tax. In effect, Arbor is arguing that it thinks it is being charged too much for utility service. If the charge is just equal to cost, it is a fee, but if it increases above cost, it transforms into a tax—apparently in its entirety, as Arbor does not appear to suggest that only the allegedly excessive portion of the charge should be considered a tax rather than a fee.

Of special resonance here is *Keller*'s approach to this issue. In *Keller*, the ambulance district, although in the best financial condition of its history, increased fees for providing certain ambulance services by 100 percent. 820 S.W.2d at 310 (Holstein, J., dissenting). Judge Holstein argued in his dissenting opinion that this was "a stark example of how onerous unrestrained user fees can be." *Id.* *Keller* observed, however, that where a political subdivision provides a service, "How much to charge users is for those elected to run the organizations. If the decisions are unpopular, the directors may be voted out of office." *Id.* at 304 (principal opinion).

*Keller* suggests that when a political subdivision provides a service in exchange for a fee, how much to charge for that service is ordinarily a matter left to the elected local leadership and that section 22(a) of the Hancock Amendment is not meant to displace user fee exactions that do not fall within its definition of "taxes" and, so, traditionally have been policed, not by the Hancock Amendment, but by the political pressures of representative democracy.[13]

This is not to say that it would not be relevant if a charge were so excessive as to be effectively unrelated to the service be-ing provided. To the contrary, this would be relevant to the fourth *Keller* factor of whether a service is being provided for the fee. If the fee is so exorbitant that it cannot be said to bear a reasonable relationship to the service, at least that excess amount cannot be said to be paid for the service itself. Here, from the state auditor's report from 2003 and from the other audits submitted below for other years, it is evident that the 10–percent gross receipts surcharge or tax on the utilities themselves made up the majority of the sums transferred. Only the additional, although still substantial, transfers of monies actually received by the utility from customers are at issue here. Nowhere is it alleged, however, much less has evidence been presented, that this in excess of what other municipal utilities charge, or of what would be a reasonable sum to compensate for the loss of revenue that a private utility otherwise would be paying the city as a franchise or similar fee. There simply has been no showing that the amount charged is so excessive as not to constitute the provision of a service or good in return for the amounts paid. Whether the amount charged otherwise is appropriate or inappropriate as a matter of public policy is a matter for the voters and their elected representatives, not the courts.

## IV. CONCLUSION

For these reasons, the judgment of the trial court is affirmed.

All concur.

---

13. There is no claim here that relief is appropriate under the principles set out in *Forest City v. City of Oregon*, 569 S.W.2d 330, 334 (Mo.App.1978) (pre-Hancock case challenging municipal water rates and stating "Where, as is the situation here, no administrative body has jurisdiction of the rate regulation, the courts do have an equitable jurisdiction to prevent a municipality from enforcing public utility charges which are clearly, palpably and grossly unreasonable").